See, also, 2005 WL 361205.

**Lawrence FOGARAZZO and Carolyn Fogarazzo, Joint Tenants With Rights of Survivorship, Stephen L. Hopkins, and Don Engel on behalf of themselves, and all others similarly situated, Plaintiffs,**

v.

**LEHMAN BROTHERS, INC., Goldman Sachs & Co., and Morgan Stanley & Co., Inc., Defendants.**

No. 03 Civ. 5194(SAS).

United States District Court, S.D. New York.

July 27, 2005.

Curtis V. Trinko, Neal A. DeYoung, Jeffrey B. Silverstein, Law Offices of Curtis V. Trinko, LLP, New York, New York, for Plaintiffs.

Alexander Dimitrief, P.C., Peter D. Doyle, Katherine J. Alprin, Kirkland & Ellis LLP, New York, New York, for Defendant Morgan Stanley & Co., Inc.

Moses Silverman, H. Christopher Boehning, Paul, Weiss, Rifkind, Wharton & Garrison LLP, New York, New York, for Defendant Lehman Brothers, Inc.

David H. Braff, Stephanie G. Wheeler, Sullivan & Cromwell LLP, New York, New York, for Defendant Goldman Sachs & Co.

## OPINION AND ORDER

SCHEINDLIN, District Judge.

## I. INTRODUCTION

Plaintiffs, a class of investors who bought shares of RSL Communications, Inc. ("RSL"), allege that defendants, three investment banks, fraudulently manipulated the price of RSL stock by issuing materially misleading analyst reports. Plaintiffs now move for class certification and defendants oppose the motion, asserting that individual questions of law and fact predominate over common questions.

## II. FACTS

On May 21, 2004, I issued an Opinion denying defendants' motions to dismiss and summarizing plaintiffs' claims.[1] Familiarity with that Opinion is assumed.

Plaintiffs assert that defendants Lehman Brothers, Inc. ("Lehman"), Goldman Sachs & Co. ("Goldman") and Morgan Stanley & Co. ("Morgan") engaged in a fraudulent scheme "to distort, falsify, or otherwise manipulate

their equity analyst reports on RSL Communications, Inc. ('RSL' [ ]), in exchange for lucrative investment banking business, fees, and other [ ] profits as a result of their relationships with RSL."[2] "In sum, the Banks, knowing that RSL was actually in decline, inflated the price of RSL shares and then worked doubly hard to conceal or obfuscate the meaning of every fact that would have revealed that decline to the investing public."[3]

Plaintiffs seek certification of a purported class that includes "all persons who purchased or otherwise acquired shares of RSL equities during the period from April 30, 1999 through December 29, 2000, both dates inclusive."[4] Plaintiffs assert that "hundreds, if not thousands, of geographically dispersed members" belong to the proposed class.[5] Plaintiffs seek appointment of the named plaintiffs as class representatives and assert that the named plaintiffs have claims "virtually identical to [ ] those of the members of the Class."[6] Plaintiffs also assert that the named plaintiffs "have been actively committed to litigating this case for at least two years," "are committed to conducting the vigorous prosecution required to remedy those damages [ ] suffered," and are subject to no unique defenses.[7]

## III. LEGAL STANDARD

### A. Standard of Review

The Second Circuit requires a "liberal" construction of Rule 23 of the Federal Rules of Civil Procedure ("Rule 23").[8] Thus, "to deny a class action simply because all of the allegations of the class do not fit together like pieces in a jigsaw puzzle [ ] would de-

---

1. See Fogarazzo v. Lehman Bros., Inc., 341 F.Supp.2d 274 (S.D.N.Y.2004).

2. Memorandum of Law in Support of Motion for Class Certification ("Pl.Mem.") at 2.

3. Fogarazzo, 341 F.Supp.2d at 292.

4. Complaint ¶ 13.

5. Pl. Mem. at 7.

6. Id. at 11.

7. Id.

8. See Korn v. Franchard Corp., 456 F.2d 1206 (2d Cir.1972); In re Lloyd's Am. Trust Fund Litig., No. 96 Civ. 1262, 1998 WL 50211, at *5 (S.D.N.Y. Feb. 6, 1998) ("The Second Circuit has directed district courts to apply Rule 23 according to a liberal rather than a restrictive interpretation.").

stroy much of the utility of Rule 23." [9] Notwithstanding the general liberality in this circuit towards class certification motions, the Supreme Court unequivocally requires district courts to undertake a "rigorous analysis" that the requirements of Rule 23 have been satisfied.[10]

In ruling on class certification, a district court may not simply accept the allegations of plaintiffs' complaint as true.[11] Rather, it must determine, after a "rigorous analysis," whether the proposed class comports with all of the elements of Rule 23. "[S]ometimes it may be necessary for the court to probe behind the pleadings before coming to rest on the certification question.... [A]ctual, not presumed, conformance with Rule 23(a) remains ... indispensable." [12]

"In order to pass muster, plaintiffs—who have the burden of proof at class certification—must make 'some showing'" that the proposed class comports with Rule 23.[13] That showing may take the form of, for example, expert opinions, evidence (by document, affidavit, live testimony, or otherwise), or the uncontested allegations of the complaint. However, "a district court is forbidden to weigh the evidence on class certification [and] plaintiffs need not establish the elements of Rule 23 by a preponderance of the evidence." [14]

## B. The Requirements of Rule 23

Rule 23 governs class certification. To be certified, a putative class must meet all four requirements of Rule 23(a) as well as the requirements of one of the three subsections of Rule 23(b). In this case, as in most cases seeking money damages, plaintiffs bear the burden of demonstrating that the class meets the requirements of Rule 23(a)—referred to as numerosity, commonality, typicality, and adequacy [15]—and that the action is "maintainable" under Rule 23(b)(3).[16] Under Rule 23(b)(3)—the only applicable subsection of Rule 23(b)—"common" issues of law or fact must "predominate over any questions affecting only individual members," and a class action must be demonstrably "superior" to other methods of adjudication.[17]

### 1. Rule 23(a)

#### a. Numerosity

Rule 23 requires that the class be "so numerous that joinder of all members is impracticable." [18] "Impracticability does not mean impossibility of joinder, but refers to the difficulty or inconvenience of joinder." [19] Although precise calculation of the number of class members is not required, and it is permissible for the court to rely on reasonable inferences drawn from available facts, numbers in excess of forty generally satisfy the numerosity requirement.[20]

#### b. Commonality

Commonality requires a showing that common issues of fact or law affect all class members.[21] A single common question may be sufficient to satisfy the commonality re-

9. *Green v. Wolf Corp.*, 406 F.2d 291, 300 (2d Cir.1968).

10. *General Tel. Co. of the Southwest v. Falcon*, 457 U.S. 147, 161, 102 S.Ct. 2364, 72 L.Ed.2d 740 (1982).

11. *See In re Initial Public Offering Sec. Litig. ("In re IPO")*, 227 F.R.D. 65, 91 (S.D.N.Y.2004).

12. *Falcon*, 457 U.S. at 161, 102 S.Ct. 2364.

13. *In re IPO*, 227 F.R.D. at 93 (quoting *Caridad v. Metro–North Commuter R.R.*, 191 F.3d 283, 292 (2d Cir.1999)) (emphasis in original).

14. *Id.* (citing *Caridad*, 191 F.3d at 293).

15. *See Caridad*, 191 F.3d at 291.

16. *See Amchem Prods., Inc. v. Windsor*, 521 U.S. 591, 614, 117 S.Ct. 2231, 138 L.Ed.2d 689 (1997).

17. Fed.R.Civ.P. 23(b)(3).

18. Fed.R.Civ.P. 23(a)(1).

19. *In re Independent Energy Holdings PLC Sec. Litig.*, 210 F.R.D. 476, 479 (S.D.N.Y.2002) (citing *In re Avon Sec. Litig.*, No. 91 Civ. 2287, 1998 WL 834366, at *5 (S.D.N.Y. Nov.30, 1998)).

20. *See Trief v. Dun & Bradstreet Corp.*, 144 F.R.D. 193, 198 (S.D.N.Y.1992).

21. *See* Fed.R.Civ.P. 23(a)(2); *see also Trief*, 144 F.R.D. at 198.

quirement.[22] "The critical inquiry is whether the common questions are at the core of the cause of action alleged." [23]

■ The commonality requirement has been applied permissively in securities fraud litigation.[24] In general, where putative class members have been injured by similar material misrepresentations and omissions, the commonality requirement is satisfied.[25]

### c. Typicality

■ The typicality requirement "is not demanding." [26] A named plaintiff's claims are "typical" pursuant to Rule 23(a)(3) where each class member's claims arise from the same course of events and each class member makes similar legal arguments to prove the defendants' liability.[27] "The rule is satisfied ... if the claims of the named plaintiffs arise from the same practice or course of conduct that gives rise to the claims of the proposed class members." [28]

In addition, a putative class representative's claims are not typical if that representative is subject to unique defenses.[29] The

test is whether the defenses will become the focus of the litigation, overshadowing the primary claims and prejudicing other class members.[30] Accordingly, the commonality and typicality requirements " 'tend to merge' because '[b]oth serve as guideposts for determining whether ... the named plaintiff's claim and the class claims are so inter-related that the interests of the class members will be fairly and adequately protected in their absence.' " [31]

### d. Adequacy

■ Plaintiffs must also show that "the representative parties will fairly and adequately protect the interests of the class." [32] To do so, plaintiffs must demonstrate that the proposed class representatives have no "interests [that] are antagonistic to the interest of other members of the class." [33] Courts have also considered "whether the putative representative is familiar with the action, whether he has abdicated control of the litigation to class counsel, and whether he is of sufficient moral character to represent a

---

**22.** *See German v. Federal Home Loan Mortgage Corp.*, 885 F.Supp. 537, 553 (S.D.N.Y.1995).

**23.** *D'Alauro v. GC Services Ltd. P'ship*, 168 F.R.D. 451, 456 (E.D.N.Y.1996) (quotation omitted). *See also In re "Agent Orange" Prod. Liab. Litig.*, 818 F.2d 145, 166–67 (2d Cir.1987).

**24.** *See In re Blech Sec. Litig.*, 187 F.R.D. 97, 104 (S.D.N.Y.1999).

**25.** *See, e.g., Blackie v. Barrack*, 524 F.2d 891, 902 (9th Cir.1975) ("Confronted with a class of purchasers allegedly defrauded over a period of time by similar misrepresentations, courts have taken the common sense approach that the class is united by a common interest in determining whether a defendant's course of conduct is in its broad outlines actionable...."); *In re Baldwin–United Corp. Litig.*, 122 F.R.D. 424, 426 (S.D.N.Y. 1986) ("The nub of plaintiffs' claims is that material information was withheld from the entire putative class in each action, either by written or oral communication. Essentially, this is a course of conduct case, which as pled satisfies the commonality requirement of Rule 23....").

**26.** *Forbush v. J.C. Penney Co.*, 994 F.2d 1101, 1106 (5th Cir.1993) (citing *Shipes v. Trinity Indus.*, 987 F.2d 311, 316 (5th Cir.1993)).

**27.** *See Robinson v. Metro–North Commuter R.R. Co.*, 267 F.3d 147, 155 (2d Cir.2001).

**28.** *Marisol A. v. Giuliani*, 929 F.Supp. 662, 691 (S.D.N.Y.1996), *aff'd*, 126 F.3d 372 (2d Cir. 1997).

**29.** *See Baffa v. Donaldson, Lufkin & Jenrette Sec. Corp.*, 222 F.3d 52, 59 (2d Cir.2000).

**30.** *See Landry v. Price Waterhouse Chartered Accountants*, 123 F.R.D. 474, 476 (S.D.N.Y.1989).

**31.** *Caridad*, 191 F.3d at 291 (alterations in original) (quoting *Falcon*, 457 U.S. at 157 n. 13, 102 S.Ct. 2364).

**32.** Fed.R.Civ.P. 23(a)(4). *See also Banyai v. Mazur*, 205 F.R.D. 160, 164 (S.D.N.Y.2002).

**33.** *Baffa*, 222 F.3d at 60. An antagonistic interest arises when there is a "fundamental conflict or inconsistency between the claims of the proposed class members" that is "so palpable as to outweigh the substantial interest of every class member in proceeding with the litigation." *In re NASDAQ Market–Makers Antitrust Litig.*, 169 F.R.D. 493, 514–15 (S.D.N.Y.1996). *See also Robinson*, 267 F.3d at 170 (holding that Rule 23(a)(4) requires "absence of conflict" between

class."[34]

Class representatives cannot satisfy Rule 23(a)(4)'s adequacy requirement if they "have so little knowledge of and involvement in the class action that they would be unable or unwilling to protect the interests of the class against the possibly competing interest of the attorneys."[35] However, it is well established that "in complex litigations such as securities actions, a plaintiff need not have expert knowledge of all aspects of the case to qualify as a class representative, and a great deal of reliance upon the expertise of counsel is to be expected."[36]

### e. Ascertainability

■ Although "'Rule 23(a) does not expressly require that a class be definite in order to be certified[,] a requirement that there be an identifiable class has been implied by the courts.'"[37] "This implied requirement is often referred to as 'ascertainability.'"[38]

"An identifiable class exists if its members can be ascertained by reference to objective criteria."[39] "Class members need not be ascertained prior to certification, but 'the exact membership of the class must be ascertainable at some point in the case.'"[40] It must thus be "administratively feasible for a court to determine whether a particular individual is a member" of the class.[41] "The Court must be able to make this determina-

tion without having to answer numerous [individualized] fact-intensive questions."[42]

### 2. Rule 23(b)

If plaintiffs can demonstrate that the proposed class satisfies the elements of Rule 23(a), they must then establish that the action is "maintainable" as defined by Rule 23(b). Rule 23(b) provides that "an action may be maintained as a class action if the prerequisites of subdivision (a) are satisfied, and in addition" one of three alternative definitions of maintainability is met. Plaintiffs argue that these putative class actions are maintainable under subsection (b)(3), which requires "that questions of law or fact common to the members of the class predominate over any questions affecting only individual members, and that a class action is superior to other available methods for the fair and efficient adjudication of the controversy."[43] Rule 23(b)(3) thus has two elements: "predominance" and "superiority."

### a. Predominance

■ "In order to meet the predominance requirement of Rule 23(b)(3), a plaintiff must establish that the issues in the class action that are subject to generalized proof, and thus applicable to the class as a whole ... predominate over those issues that are sub-

named representatives and class, as well as "vigorous prosecution").

**34.** *Noble v. 93 University Place Corp.*, 224 F.R.D. 330, 337–39 (S.D.N.Y.2004) (citations omitted).

**35.** *Baffa*, 222 F.3d at 61 (quotations and citation omitted).

**36.** *In re AM Int'l, Inc. Sec. Litig.*, 108 F.R.D. 190, 196–97 (S.D.N.Y.1985).

**37.** *In re Methyl Tertiary Butyl Ether Prod. Liab. Litig.*, 209 F.R.D. 323, 336 (S.D.N.Y.2002) (quoting *Zapka v. Coca–Cola Co.*, No. 99 Civ. 8238, 2000 WL 1644539, at *2 (N.D.Ill. Oct.27, 2000)).

**38.** *Id.* (citing *Van West v. Midland Nat'l Life Ins. Co.*, 199 F.R.D. 448, 451 (D.R.I.2001); *In re Copper Antitrust Litig.*, 196 F.R.D. 348, 358 (D.Wis.2000)).

**39.** *Id.* at 337 (quoting *Zapka*, 2000 WL 1644539, at *2). *See also Clay v. American Tobacco Co.*, 188 F.R.D. 483, 490 (S.D.Ill.1999); *Gomez v.*

*Illinois State Bd. of Educ.*, 117 F.R.D. 394, 397 (N.D.Ill.1987).

**40.** *Id.* (quoting *Rios v. Marshall*, 100 F.R.D. 395, 403 (S.D.N.Y.1983)).

**41.** *Rios*, 100 F.R.D. at 403 (citing 7 Charles Alan Wright, Arthur R. Miller & Mary Kay Kane, Fed. Prac. & Proc. § 1760 at 581 (1972)).

**42.** *Daniels v. City of New York*, 198 F.R.D. 409, 414 (S.D.N.Y.2001) (quotation omitted). A plaintiff's failure to plead a class that can be ascertained without subjective individual inquiries may cause individual issues (*i.e.*, whether each individual class member belongs in the class) to predominate. Consequently, the question of ascertainability takes on great importance in 23(b)(3) class actions, which may only be certified if common questions—not individual inquiries—predominate. *See infra* Part IV.B.

**43.** Fed.R.Civ.P. 23(b)(3).

ject only to individualized proof." [44] "The 23(b)(3) predominance requirement is 'more stringent' and 'far more demanding than' the commonality requirement of Rule 23(a)." [45] Courts frequently have found that the requirement was not met where, notwithstanding the presence of common legal and factual issues that satisfy the commonality requirement, individualized inquiries predominate.[46] Nonetheless, the Supreme Court has noted that "[p]redominance is a test readily met in certain cases alleging consumer or securities fraud. . . ." [47]

### b. Superiority

■ The superiority prong of Rule 23(b)(3) requires a court to consider whether a class action is superior to other methods of adjudication.[48] The court should consider, *inter alia*, "the interest of the members of the class in individually controlling the prosecution or defense of separate actions" and "the difficulties likely to be encountered in the management of a class action." [49]

### 3. Rule 23(g)

Rule 23(g) requires a court to assess the adequacy of proposed class counsel. To that end, the court *must* consider the following:

(1) the work counsel has done in identifying or investigating potential claims in the action, (2) counsel's experience in handling class actions, other complex litigation, and claims of the type asserted in the action, (3) counsel's knowledge of the applicable law, and (4) the resources counsel will commit to representing the class.[50] "The court *may* also consider any other matter pertinent to counsel's ability to fairly and adequately represent the interests of the class." [51]

## IV. DISCUSSION

### A. Rule 23(a) and Rule 23(g)

Defendants do not argue that the purported class fails to comply with the requirements of Rule 23(a).[52] I find that plaintiffs have met their burden to make "some showing" that the proposed class satisfies Rule 23(a).

With respect to numerosity, plaintiffs assert "that there are many hundreds, if not thousands, of geographically dispersed members of the proposed class." [53] Indeed, because plaintiffs allege fraud in connection with publicly traded securities, common sense dictates that the purported plaintiff class is likely quite numerous.[54] Accordingly,

44. *In re Visa Check/MasterMoney Antitrust Litig.*, 280 F.3d 124, 136 (2d Cir.2001) (quotation marks and citation omitted).

45. *Maneely v. City of Newburgh*, 208 F.R.D. 69, 76 (S.D.N.Y.2002) (quoting *Amchem Prods.*, 521 U.S. at 623–24, 117 S.Ct. 2231).

46. *See, e.g., In re MTBE*, 209 F.R.D. at 350 (finding individual issues predominate although defendants conceded commonality); *Augustin v. Jablonsky*, No. 99–CV–3126, 2001 WL 770839, at *13 (E.D.N.Y. Mar.8, 2001) (finding individualized issues of proximate causation predominate despite plaintiffs' showing of commonality under Rule 23(a)(2)); *Martin v. Shell Oil Co.*, 198 F.R.D. 580, 592–93 (D.Conn.2000) (finding individualized proof of breach, causation, and trespass predominates where commonality was not contested).

47. *Amchem Prods.*, 521 U.S. at 625, 117 S.Ct. 2231.

48. *See* Fed.R.Civ.P. 23(b)(3); *see also Eisen v. Carlisle & Jacquelin*, 417 U.S. 156, 164, 94 S.Ct. 2140, 40 L.Ed.2d 732 (1974).

49. Fed.R.Civ.P. 23(b)(3).

50. *See In re IPO*, 227 F.R.D. at 89 (quotation marks and citation omitted). *See also In re Drexel Burnham Lambert Group, Inc.*, 960 F.2d 285, 291 (2d Cir.1992) ("[C]lass counsel must be qualified, experienced and generally able to conduct the litigation.") (quotation marks and citation omitted).

51. Rule 23(g)(1)(C)(ii) (emphasis added).

52. *See* Defendants' Memorandum of Law in Opposition to Plaintiffs' Motion for Class Certification ("Def.Opp.") at 1 (noting that defendants address "two fundamental reasons" why plaintiffs' class might not be certified—transaction causation and loss causation—both of which address the Rule 23(b)(3) predominance requirement).

53. Pl. Mem. at 7.

54. *See In re Blech Sec. Litig.*, 187 F.R.D. 97, 103 (S.D.N.Y.1999).

plaintiffs have satisfied the Rule 23(a)(1) numerosity requirement. Similarly, because the proposed class includes all purchasers of RSL securities during a given time period, it presents no unusual difficulties in ascertaining class membership.[55]

■ With respect to the Rule 23(a)(2) commonality requirement, plaintiffs note that the following questions are common to all class members: whether defendants' analyst reports contained misrepresentations or omissions; whether those misstatements were material; whether those misstatements were issued as part of improper *quid pro quo* arrangements; whether those misstatements artificially inflated securities prices; and whether class members sustained damages when artificial inflation dissipated.[56] Although defendants contend that individual questions predominate over these common questions, plaintiffs have satisfied Rule 23(a)(2)'s requirement that "there are questions of law or fact common to the class."

The proposed class representatives—Lawrence Fogarazzo, Carolyn Fogarazzo, Stephen L. Hopkins and Don Engel—satisfy the remaining Rule 23(a) requirements of typicality and adequacy. The representatives' claims are based on the same allegations of misconduct as those of all other class members, and no class representative appears to have any conflicts of interest with other members of the class.[57] Moreover, defendants have not asserted any unique defenses with respect to any of the class representatives, and the representatives have fulfilled their duties throughout the course of this litigation.

Similarly, the representatives' choice of counsel, the Law Offices of Curtis V. Trinko, LLP ("Trinko"), is adequate to represent the interests of the class. Class counsel has more than 23 years of experience prosecuting securities fraud class actions.[58] Furthermore, class counsel has actively represented the purported class throughout this litigation. Accordingly, the class representatives' selection of Trinko as lead counsel satisfies Rule 23(g).

## B. Predominance

Defendants oppose plaintiffs' motion for class certification on two grounds: *first,* that "common issues do not predominate because plaintiffs cannot establish transaction causation on a class-wide basis;" and *second,* that "common issues do not predominate because plaintiffs cannot establish loss causation by class-wide proof." [59] Both arguments rest on the predominance requirement of Rule 23(b)(3).

### 1. Transaction Causation

In the securities fraud context, plaintiffs may prove transaction causation either on an individual basis or by showing that they are entitled to an established presumption of reliance. The distinction is crucial at the class certification stage. If transaction causation turns on whether the class as a whole is entitled to a presumption of reliance, then transaction causation is a common issue. If, on the other hand, each class member must individually prove reliance, then the individualized transaction causation inquiry threatens to overwhelm any common issues that may be adjudicated, and class certification will likely be denied.[60]

Plaintiffs assert that they are entitled to prove reliance through resort to two judicially established presumptions: (1) the fraud on the market presumption; and (2) the *Affili-*

---

55. *Cf. In re IPO,* 227 F.R.D. at 100–01 (addressing ascertainability difficulties where some purchasers of the subject securities were active participants in the alleged scheme; certifying class definition that screened out likely participants).

56. *See* Pl. Mem. at 8–9.

57. *See id.* at 9–12.

58. *See* Firm Resume, Ex. E to Declaration of Curtis V. Trinko, counsel for plaintiffs, in Support of Motion for Class Certification ("Trinko Decl.").

59. Def. Opp. at 7, 15.

60. *See In re PolyMedica Corp. Sec. Litig.,* 224 F.R.D. 27, 38–39 (D.Mass.2004) (noting that individual showings of reliance would "overwhelm the common questions of fact and law," but that resort to a presumption obviates the need to prove reliance individually).

*ated Ute* presumption.[61] Defendants contest the applicability of both presumptions.

### a. The Fraud on the Market Presumption

█ In *Basic, Inc. v. Levinson*,[62] the Supreme Court established the validity of the fraud on the market presumption:

> The fraud on the market theory is based on the hypothesis that, in an open and developed securities market, the price of a company's stock is determined by the available material information regarding the company and its business.... Misleading statements will therefore defraud purchasers of stock even if the purchasers do not directly rely on the misstatements.... The causal connection between the defendants' fraud and the plaintiffs' purchase of stock in such a case is no less significant than in a case of direct reliance on misrepresentations.[63]

Defendants "submit that the *Basic* presumption does not apply to analyst reports."[64] Defendants acknowledge that no binding precedent compels such a conclusion, but point to the Second Circuit's Rule 23(f) grant of interlocutory review in *Hevesi v.*

*Citigroup Inc.*[65] as evidence that "[t]he Second Circuit has recognized that substantial issues exist as to the applicability of the *Basic* presumption to analyst reports."[66] Defendants also rely on *DeMarco v. Lehman Bros., Inc.*,[67] in which Judge Jed Rakoff stated that "there is a qualitative difference between a statement of fact emanating from an issuer and a statement of opinion emanating from a research analyst."[68]

However, although the court found that the presumption did not apply in that case, it nonetheless "conclude[d] that the fraud-on-the-market doctrine may in certain conditions apply to analyst reports...."[69] Indeed, there is nothing in the language of *Basic* that suggests that the presumption should be limited to statements made by issuers themselves.[70] Rather, the fraud on the market presumption holds that "[b]ecause most publicly available information is reflected in market price, an investor's reliance on *any* public material misrepresentations, therefore, may be presumed for purposes of a Rule 10b–5 action."[71] Thus, the fraud on the market inquiry is dependent not on who *made* a misstatement, but whether the statement was *material*.[72] A blanket

---

61. *See Affiliated Ute Citizens v. United States*, 406 U.S. 128, 151, 92 S.Ct. 1456, 31 L.Ed.2d 741 (1972). *Accord Castellano v. Young & Rubicam, Inc.*, 257 F.3d 171, 186 (2d Cir.2001); *Press v. Chemical Inv. Servs. Corp.*, 166 F.3d 529, 539 (2d Cir.1999).

62. 485 U.S. 224, 108 S.Ct. 978, 99 L.Ed.2d 194 (1988).

63. *Id.* at 241–42, 108 S.Ct. 978 (quotation marks and citation omitted).

64. Def. Opp. at 17.

65. 366 F.3d 70, 77 (2d Cir.2004).

66. Def. Opp. at 16. The Second Circuit never decided the issues, though, because the parties in *Hevesi* settled before a decision was filed. *See DeMarco v. Robertson Stephens Inc.*, 228 F.R.D. 468, 473 (S.D.N.Y.2005). The Second Circuit has again granted review to determine "[w]hether the presumption of reliance established in *Basic* ... was properly extended to plaintiffs' claims against [ ] non-issuer defendants...." Order granting interlocutory appeal in *Miles v. Merrill Lynch & Co.*, No. 04–8026 (2d Cir. June 30, 2005). *See also* Pamela A. MacLean, *Investor*

*Suits May Face New Challenge*, Nat'l L.J., July 18, 2005 (discussing the *Miles* order and collecting cases).

67. 222 F.R.D. 243 (S.D.N.Y.2004).

68. *Id.* at 246; *but see DeMarco v. Robertson Stephens*, 228 F.R.D. 468, 473–74 (holding that the fraud on the market theory is applicable to material misstatements made by analysts).

69. *DeMarco v. Lehman Bros.*, 222 F.R.D. at 245.

70. *See DeMarco v. Robertson Stephens*, 228 F.R.D. 468, 473–74 (noting that "[n]othing in the language of *Basic* limits its holding to issuer statements alone"); *but see Hevesi*, 366 F.3d at 77 ("Although the fraud-on-the-market doctrine clearly applies to statements made by *issuers*, as in *Basic*, we have never addressed whether it also applies to reports by *analysts*.") (emphasis in original).

71. *Basic*, 485 U.S. at 247, 108 S.Ct. 978 (emphasis added).

72. *See, e.g., DeMarco v. Robertson Stephens*, 228 F.R.D. 468, 474–75 (holding that "the fraud-on-the-market theory must apply to any *material*

prohibition on applying the fraud on the market presumption to analyst reports is thus inconsistent with the requirements of *Basic.*

Defendants argue, in the alternative, that "[e]ven if *Basic* were held to apply to analyst reports, Plaintiffs would not be entitled to the presumption because they have not demonstrated that the price of RSL was actually distorted by Defendants' analyst reports." [73] However, there is no requirement at the class certification stage that plaintiffs prove that they are entitled to damages; rather, plaintiffs must make "some showing" that the class comports with Rule 23. Nonetheless, defendants argue that plaintiffs must *first* prove that a "material misrepresentation actually distort[ed] the market price," and only *then* are they entitled to use the fraud on the market presumption to establish that they relied on that price.[74]

I disagree. The question at the class certification stage is not whether plaintiffs will ultimately be able to prove that the price of securities was manipulated, but whether questions of transaction causation may be resolved on a common basis. Where a material misrepresentation is alleged to have affected the prices of securities traded on a efficient market, the fraud on the market doctrine is applicable, and plaintiffs' allegations of transaction causation rely on common proof.[75]

Thus, defendants' argument that plaintiffs are not entitled to the presumption because they "have offered no evidence that Defendants' analyst reports actually distorted the market price of RSL throughout the class period" is unavailing.[76] The fraud on the market presumption is simply a "useful device[ ] for allocating the burdens of proof between parties;" [77] in the class certification context, it allows plaintiffs to prove reliance by proving "that the scheme as a whole artificially inflated prices." [78] Whether alleged misrepresentations *in fact* altered securities prices is a question of fact, not a Rule 23 inquiry. If, at a later stage of litigation, plaintiffs are unable to prove that the alleged misrepresentations were material, and hence that they did not affect securities prices, then the common question of transaction causation will be answered in the negative. If, on the other hand, plaintiffs successfully prove that the alleged fraud inflated securities prices, that common question will be answered in the affirmative. Accordingly, I find that plaintiffs may employ the fraud on the market presumption to prove transaction causation on a common basis.

### b. The *Affiliated Ute* Presumption

 Under the *Affiliated Ute* presumption, "[i]n securities fraud claims, reliance is presumed when the claim rests on the omission of a material fact." [79] This presumption

false information" and that, "[w]hile not every opinion by every self-proclaimed analyst will be material, the significant role of respected analysts as intermediaries in investors' assessments of value, and the lengths to which some analysts have allegedly gone to disguise their true opinions of stocks they wish to promote, make clear that such opinions will sometimes be material") (emphasis in original).

73. Def. Opp. at 18.

74. *Id. See also id.* ("This theory is available only if the plaintiff *actually* relied on a market price that was *actually* distorted by the defendant.") (emphasis in original).

75. Defendants do not dispute that RSL was traded on an efficient market. Moreover, RSL shares "were traded on the NASDAQ National Market ... were traded at high volumes during the class period ... [and were] extensively followed by analysts and received extensive media

attention." Pl. Mem. at 19 (citing *In re IPO,* 227 F.R.D. at 106 (analyzing market efficiency regarding securities with similar characteristics)).

76. Def. Opp. at 18. Indeed, plaintiffs have submitted some evidence that the alleged scheme affected stock prices. *See* Report of Paul J. Irvine ("Irvine Report"), Ex. D to Trinko Decl., at 47 (applying cumulative abnormal return methodology, *see infra* Part IV.B., to determine that several positive and negative announcements by defendants were associated with abnormal movements in RSL share prices). Defendants challenge Dr. Irvine's findings, but class certification proceedings are not the proper time to argue the weight of the evidence.

77. *Basic,* 485 U.S. at 245, 108 S.Ct. 978.

78. *In re IPO,* 227 F.R.D. at 106 n. 319.

79. *In re WorldCom, Inc. Sec. Litig.,* 219 F.R.D. 267, 291 (S.D.N.Y.2003) (citing *Affiliated Ute,*

of reliance is not conclusive.[80] Rather, "once the plaintiff establishes the materiality of the omission ... the burden shifts to the defendant to establish ... that the plaintiff did not rely on the omission in making the investment decision."[81] To satisfy this burden, a defendant must prove "that 'even if the material facts had been disclosed, plaintiff's decision as to the transaction would not have been different from what it was." '[82]

Defendants assert that "the *Affiliated Ute* presumption of reliance applies only in cases that are premised entirely or primarily on omissions."[83] Defendants cite decisions of the Fifth, Ninth and Tenth Circuits for this proposition.[84] However, where plaintiffs' claims are based on a combination of omissions and misstatements, courts in this Circuit have acknowledged the applicability of the *Affiliated Ute* presumption.[85] Indeed,

the theory behind the *Affiliated Ute* presumption—that, when material information is concealed, plaintiffs should only have to prove that "a reasonable investor might have considered the omitted facts important in the making of [her] investment decision"[86]—is not undermined simply because a defendant makes misstatements at the same time it omits material information. In this case, plaintiffs allege that defendants omitted their own *quid pro quo* arrangements in addition to deliberately misrepresenting their opinions. If plaintiffs prove that a reasonable investor might have considered the omitted facts material in making an investment decision, then plaintiffs may employ the *Affiliated Ute* presumption to establish reliance on a common basis with respect to the alleged omissions.[87]

406 U.S. at 153–54, 92 S.Ct. 1456). *Accord Castellano,* 257 F.3d at 186.

**80.** *See duPont v. Brady,* 828 F.2d 75, 78 (2d Cir.1987).

**81.** *Id.* at 76.

**82.** *Id.* at 78 (quoting *Rochez Bros. v. Rhoades,* 491 F.2d 402, 410 (3d Cir.1974)).

**83.** Def. Opp. at 19.

**84.** *See id.* at 20 (citing *Joseph v. Wiles,* 223 F.3d 1155, 1162 (10th Cir.2000) (holding that a court must "analyze the complaint to determine whether the offenses it alleges can be characterized primarily as omissions or misrepresentations in order to determine whether the *Affiliated Ute* presumption should apply"); *Binder v. Gillespie,* 184 F.3d 1059, 1064 (9th Cir.1999) ("We agree with these circuits that the *Affiliated Ute* presumption should not be applied to cases that allege both misstatements and omissions unless the case can be characterized as one that primarily alleges omissions."); *Finkel v. Docutel/Olivetti Corp.,* 817 F.2d 356, 359 (5th Cir.1987) (asserting, before *Basic* was decided, that "[a] court must, therefore, analytically characterize a 10b–5 action as either primarily a nondisclosure case (which would make the [*Affiliated Ute*] presumption applicable), or a positive misrepresentation case")). Defendants also cite the Second Circuit's 1981 opinion in *Wilson v. Comtech Telecomms. Corp.,* 648 F.2d 88, 93 (2d Cir.1981), which opined that "[w]hat is important is to understand the rationale for a presumption of causation in fact in cases like *Affiliated Ute,* in which no positive statements exist: reliance as a practical matter is impossible to prove." *Wilson,* which preceded *Basic,* did not purport to limit *Affiliated Ute* to cases in which "no positive state-

ments exist;" rather, it compared the factual situation of *Affiliated Ute* to the facts of *Wilson,* an appeal of judgment after trial in which the factual record showed that the plaintiff had not proved reliance on any alleged misstatements. Indeed, *Wilson* notes that "[t]o characterize this, for purposes of establishing reliance [under *Affiliated Ute* ], as either an omission or a misrepresentation case is to beg the question." *Id.* at 93. Rather, in *Wilson,* plaintiff's theory of liability was based on defendant's alleged "duty to correct [earnings] projections once new information made them inaccurate." *Id.*

**85.** *See, e.g., In re IPO,* 227 F.R.D. at 105; *In re WorldCom,* 219 F.R.D. at 291. The Second Circuit has repeatedly noted that *Basic* and *Affiliated Ute* are available when there are "unusual 'problems of proof,' " such as where "the integrity of the market is alleged to have been compromised" and "where total non-disclosure of material information was alleged." *Harsco Corp. v. Segui,* 91 F.3d 337 (2d Cir.1996) (quoting *Feinman v. Dean Witter Reynolds,* 84 F.3d 539, 541– 42 (2d Cir.1996)). The Second Circuit has never adopted an either/or requirement for applicability of the fraud on the market or *Affiliated Ute* presumptions.

**86.** *Affiliated Ute,* 406 U.S. at 153–54, 92 S.Ct. 1456.

**87.** In any event, the fraud on the market and *Affiliated Ute* presumptions will likely be coextensive in this case. Both presumptions depend on whether the omitted information or the misstated information is material. If plaintiffs cannot establish that the misrepresentations were material, then neither presumption will save plaintiffs' claims; if, on the other hand, plaintiffs can prove

It can be argued that the *Affiliated Ute* presumption is simply the fraud on the market presumption applied to material omissions. Both presumptions depend on the materiality of the undisclosed or misstated information.[88] If reasonable investors might have considered a fact material in making investment decisions, then it stands to reason that such material facts, if known, would have affected the stock prices. Thus, an investor who buys artificially inflated shares relying on the market price to reflect all material information about a security is harmed whether the shares are inflated by misstatements or by omissions. In any event, plaintiffs may use either presumption to prove transaction causation on a common basis.

## 2. Loss Causation

In a securities fraud case based on misrepresentations or omissions, plaintiffs must prove that defendants' alleged wrongdoing concealed some risk from plaintiffs.[89] To prove loss causation, plaintiffs must then show "both that the loss [was] foreseeable *and* that the loss [was] caused by the materialization of the concealed risk." [90]

Under Rule 23(b)(3), plaintiffs must make some showing that common questions will predominate over individual questions. Because individual adjudication of loss causation would cause individual issues to predominate, plaintiffs in securities fraud actions "must present a methodology for determining loss causation that may be commonly applied to all members of the class." [91] Plaintiffs may submit an expert report suggesting a methodology for determining such a link.[92] "A district court must ensure that the basis of [such an] expert opinion is not so flawed that it would be inadmissible as a matter of law." [93] At the class certification stage, the question "is whether plaintiffs' expert evidence is sufficient to demonstrate common questions of fact warranting certification of the proposed class, not whether the evidence will ultimately be persuasive;" a district court should therefore refrain from "weigh[ing] conflicting expert evidence or engag[ing] in 'statistical dueling' of experts." [94]

Plaintiffs have submitted the declaration of Dr. Paul J. Irvine, "an expert on security analysts and the markets," who has published and peer-reviewed several articles regarding securities analysts, in support of their contention that loss causation is susceptible to class-wide proof.[95] Defendants have coun-

that some, but not all, of the alleged omissions and misstatements were material, then the availability of both presumptions allows plaintiffs to be fairly compensated for each material misstatement and omission.

**88.** *See, e.g., Finkel,* 817 F.2d at 360 (noting that the fraud on the market presumption "constructs an environment which is hospitable to the reliance presumption of Affiliated Ute" and that the two presumptions "interact"); *see also Panzirer v. Wolf,* 663 F.2d 365, 368 (2d Cir.1981) (noting, before *Basic* approved the fraud on the market theory, that "[r]elying on Affiliated Ute, this and other circuits do not require direct reliance where the fraud affects the market, on the ground that an investor relies generally on the supposition that the market price is validly set and that no unsuspected fraud has affected the price."), *vacated as moot by Price Waterhouse v. Panzirer,* 459 U.S. 1027, 1027, 103 S.Ct. 434, 74 L.Ed.2d 594 (1982).

**89.** *See Lentell v. Merrill Lynch & Co., Inc.,* 396 F.3d 161, 173 (2d Cir.2005) (plaintiffs must allege "that the misstatement or omission concealed something from the market....").

**90.** *Id. See also In re IPO ("Liu v. CSFB"),* No. 21 MC 92, 2005 WL 1529659, at *5 (S.D.N.Y. June 28, 2005).

**91.** *In re IPO,* 227 F.R.D. at 111 (citing *Visa Check,* 280 F.3d at 134–35). *See also In re Sumitomo Copper Litig.,* 182 F.R.D. 85, 91 (S.D.N.Y. 1998) (granting class certification upon finding that "plaintiffs' econometric methodologies have a reasonable probability of establishing" plaintiffs' claims by common proof). *But see Newton v. Merrill, Lynch, Pierce, Fenner & Smith, Inc.,* 259 F.3d 154, 189 (3d Cir.2001) (where determining the existence of loss would require individual analysis of each investor's trades, "[t]he individual questions ... are overpowering").

**92.** *See, e.g., Visa Check,* 280 F.3d at 134–35 (examining submission of expert report to show loss causation in the antitrust class action context); *In re IPO,* 227 F.R.D. at 111 (same, in securities fraud context).

**93.** *Visa Check,* 280 F.3d at 135.

**94.** *Id.* (citing *Caridad,* 191 F.3d at 292–93).

**95.** Irvine Report at 4.

tered with the report of Dr. John W. Peavy III, a professor of finance, financial consultant and investment advisor,[96] addressing the question of "whether Plaintiffs [and Dr. Irvine] have offered a scientific methodology that can be used to establish whether or not the Defendants' reports had at least some sustained impact on RSL's stock price throughout the Proposed Class Period."[97] Plaintiffs have also submitted a reply report by Dr. Irvine that responds to methodological criticisms levied by Dr. Peavy and demonstrates how losses could be calculated using the methodologies described in the Irvine Report.[98]

In my May 21, 2004 Opinion denying defendants' motions to dismiss, I summarized plaintiffs' loss causation allegations as follows: "the Banks, knowing that RSL was actually in decline, inflated the price of RSL shares and then worked doubly hard to conceal or obfuscate the meaning of every fact that would have revealed that decline to the investing public."[99] When facts contradicting defendants' reports became public, under plaintiffs' theory, some of the artificial inflation caused by defendants' reports would have dissipated; by contrast, when defendants issued fraudulent reports, the level of artificial inflation increased.[100] Thus, the allegedly concealed risk—i.e., that RSL was failing—materialized as RSL declined, and plaintiffs' losses were caused when news of that decline caused the artificial inflation created by fraudulent analyst reports to dissipate.

The Irvine Report proposes two possible methods by which plaintiffs might prove loss causation on a common basis. The Irvine Report first suggests that price dissipation throughout the class period might be proved by providing "*first,* an analysis of the initial inflation caused by alleged [fraudulent reports]; and *second,* an analysis of the dissipation of that inflation over time.' "[101]

This methodology, approved in my October 13, 2004 Opinion granting class certification in six focus cases that are part of the *In re IPO,* 227 F.R.D. 65, 91 (S.D.N.Y.2004) proceedings, is inapplicable to the present case. The alleged fraud in *In re IPO* involves a scheme of market manipulation through which customers purchasing securities in IPOs were required to commit to purchasing more shares in the aftermarket, increasing demand for shares and causing artificial inflation.[102] *In re IPO* is thus primarily a case about market manipulation, as opposed to misstatements and omissions. The mechanisms of loss causation differ:

> Once a misstatement or omission infects the pool of available information, it continues to affect the stock price until contradictory information becomes available. The inflationary effect of misstatements or omissions, therefore, should be constant. Manipulative conduct is different. A market manipulation is a discrete act that in-

96. *See* Expert Report of John W. Peavy III ("Peavy Report"), Ex. A to 3/14/05 Declaration of Stephanie G. Wheeler, counsel for defendants, at 3.

97. Peavy Report at 1.

98. *See* 4/27/05 Reply Report of Dr. Paul J. Irvine ("Irvine Reply Report"). The parties have disagreed regarding whether plaintiffs were permitted to submit the Irvine Report. *See* 6/10/05 Letter from Defendants to the Court (asserting that the Irvine Reply Report was not permitted under the parties' scheduling agreement and moving to strike, or in the alternative requesting leave to file a sur-reply); 6/15/05 Letter from Plaintiffs to the Court (showing that the Irvine Reply Report, though not explicitly authorized by the parties' agreement, was nonetheless contemplated by the parties and the Court). To the extent the Irvine Reply Report provides examples and demonstrates the robustness of the method-

ology proposed in the Irvine Report, it is permissible. However, to the extent that the Irvine Reply Report proposes new methodologies or quibbles with defendants' briefs and the methodology of defendants' expert report, *see, e.g.,* Irvine Reply Report at 14–15, 18, the Irvine Reply Report has been disregarded.

99. *Fogarazzo,* 341 F.Supp.2d at 292.

100. *See* Irvine Report at 48.

101. *See id.* at 46 (quoting *In re IPO,* 227 F.R.D. at 112).

102. *See In re IPO,* 227 F.R.D. at 112 (noting that "[i]n a market manipulation case, plaintiffs can satisfy their burden by presenting a means to determine that the scheme caused an increase in price that dissipated throughout the class period.").

fluences stock price. Once the manipulation ceases, however, the information available to the market is the same as before, and the stock price gradually returns to its true value.[103]

The instant case, unlike *In re IPO*, is premised on misrepresentations and omissions. Accordingly, plaintiffs may not avail themselves of the loss causation methodology used in *In re IPO*; rather, a valid loss causation methodology in this case must be able to analyze the inflationary effects of the alleged misrepresentations or omissions and the alleged corrective events.[104]

The Irvine Report also suggests an analysis that focuses on market price reactions to specific analyst recommendations:

> In addition, unlike the *IPO Securities Litigation* case, a more interesting estimation procedure is available. If the court accepts the Plaintiffs' demonstration that the Defendants' analysts' reports were successful in 'propping up' the price of the stock, then an estimate of the degree to which the Defendants were successful can be obtained by an analysis of the price reaction when the props were partially removed.[105]

The Irvine Report analyzes the price effects of several analyst reports through application of a "cumulative abnormal return" analysis. Essentially, Irvine's analysis takes a three-day snapshot of securities prices, including the day preceding an event, the day of the event itself, and the day after the event. This period of time is known as the "event window."[106] The return of the relevant security—*i.e.*, the change in price of that security during the event window—is calculated and compared to a "market benchmark." The market benchmark consists of the combined performances of several securities; in his report, Dr. Irvine compared RSL prices over each event window to three market benchmarks, including the overall performance of the S & P 500 Composite Index. The "cumulative abnormal return" is the amount by which the subject security's return differed from the return of the market benchmark over the event window.[107] For example, if, on the day of an event, the stock price of RSL opened at $10 and closed at $20, while the S & P 500 Composite Index opened at $10 and closed at $15, a 100% abnormal return is associated with the event.[108]

The Irvine Report asserts that "[t]he market responses to analysts' recommendations for RSL indicate an unusually large reliance of the market on the recommendations of Defendants' analysts."[109] For example, "[o]n March 28, 2000, Morgan Stanley issued [a] Strong Buy recommendation and the stock responded with a 13.5% 3–day abnormal return."[110] By contrast "on October 6, 2000, Morgan downgraded the stock to a Hold recommendation. The market respond-

**103.** *In re IPO*, 297 F.Supp.2d 668, 674 (S.D.N.Y. 2003) (citations omitted).

**104.** *See In re IPO* (*"Liu v. CSFB"*), No. 21 MC 92, 399 F.Supp.2d 261, 266–67, 2005 WL 1162445, at *3–4 (S.D.N.Y. May 16, 2005).

**105.** Irvine Report at 48.

**106.** Dr. Irvine notes that event windows need not be three days long. Event windows comprising only the day of the event, or the day of the event and the day immediately following the event, may also be used. The three-day event window technique used by Dr. Irvine, which extends the window to the day preceding the event, is able to incorporate returns that may be attributable to an event that is recorded on the event date, but actually occurred the day before the event date. Although Dr. Irvine notes that the three-day window is "very conservative," "reduces the statistical significance of the results" and "will less frequently report statistically significant results than ... event studies using only [the] event day," it is the technique "that is generally followed." Irvine Reply Report at 3.

**107.** *See id.* at 2–3.

**108.** The return of RSL in this hypothetical is twice as much, or 100% more, than the return of the market benchmark.

**109.** Irvine Report at 47.

**110.** *Id.* It is somewhat unclear from this statement whether Dr. Irvine meant that RSL did 22.3% *worse* than the market benchmark, or whether the stock price simply fell 22.3%. However, Dr. Irvine's inclusion of this statement in a section describing "[e]vidence ... from an analysis of the abnormal returns surrounding the release of these reports" implies that 22.3% refers to the abnormal return associated with Morgan's downgrading. *Id.*

ed negatively to the news[,] falling by 22.3%." [111]

The Peavy Report criticizes Dr. Irvine's proposed methodology, asserting that accurate price impact "cannot be scientifically determined in the presence of confounding events." [112] The thrust of Dr. Peavy's argument is that "confounding events"—*i.e.*, events separate from defendants' analyst reports that may have affected RSL prices— mask the effects of the alleged misrepresentations. Such confounding events include, *inter alia*, earnings reports issued by RSL, announcements of new mergers, acquisitions and joint ventures involving RSL, and announcements of new RSL products. [113]

However, class certification is not the time to wage a battle of the experts; nor is it a time to engage in the weighing of contradictory facts. [114] Defendants will have the opportunity to present their own analyses of the effects of the alleged misrepresentations, which may include alternative theories as to exactly what caused the price effects cited by Dr. Irvine. Dr. Irvine's analysis of the cumulative abnormal returns associated with events in defendants' analyst coverage of RSL provides a satisfactory methodology for determining loss causation on a common basis. Indeed, defendants' arguments that confounding events are responsible for the price changes in RSL shares, or make it impossible to quantify the precise impact of the alleged fraud, are arguments that address the weight of plaintiffs' common evidence. If plaintiffs cannot ultimately prove that the alleged fraud artificially inflated RSL's stock prices, then they will fail on a *common* basis. At the class certification stage, plaintiffs need only show that their claims are susceptible to common proof. Plaintiffs have done so with respect to loss causation.

### C. Superiority

■ Rule 23 suggests a number of nonexclusive factors the trial judge can weigh to determine superiority, including "the interest of members of the class in individually controlling the prosecution." [115] Where thousands of potential claimants assert claims based on predominantly common issues, though, "a class member's interest in *aggregating* the claims substantially outweighs her interest in individual control of the litigation." [116] Adjudicating the claims of class members in this case as individual claims would waste substantial judicial resources. In addition, because many of the members of the proposed class may not have invested heavily in RSL securities, litigating an individual case would likely cost far more than the potential recovery. Moreover, because there will likely be no difficulty in ascertaining the membership of the class, and because common questions predominate over individual questions. I find that the class form is superior to any alternative method of adjudication in this case.

## V. CONCLUSION

Plaintiffs' motion is granted. The proposed class, which includes "all persons who purchased or otherwise acquired shares of RSL equities during the period from April 30, 1999 through December 29, 2000, both dates inclusive," is hereby certified. Lawrence Fogarazzo, Carolyn Fogarazzo, Stephen L. Hopkins and Don Engel are appointed class representatives, and the Law Offices of Curtis V. Trinko, LLP is appointed Class Counsel. A conference is scheduled for 5:00 P.M. on August 4, 2005, in Courtroom 15C.

SO ORDERED:

111. *Id.*

112. Peavy Report at 7.

113. *See id.* at 10.

114. *See In re IPO,* 227 F.R.D. at 111.

115. Fed.R.Civ.P. 23(b)(3)(A).

116. *In re IPO,* 227 F.R.D. at 121.