James NEWMAN, Plaintiff,

v.

**RCN TELECOM SERVICES, INC., et al, Defendants.**

**No. 05 Civ. 4816(VM).**

United States District Court, S.D. New York.

July 27, 2006.

Irving Bizar, Ballon, Stoll, Bader and Nadler, New York, NY, for Plaintiff.

Anthony X. Arturi, Jr., Arturi, D'Argenio & Guaglardi, L.L.P., Englewood Cliffs, NJ, Barry Scott Guaglardi, Arye, Lustig & Sassower, P.C., New York, NY, for Defendants.

## DECISION AND ORDER

MARRERO, District Judge.

### I. BACKGROUND

By Order dated March 7, 2006, Magistrate Judge Andrew Peck, to whom this matter had been referred for pretrial supervision, issued a Report and Recommendation (the "Report"), a copy of which is attached and incorporated herein, recommending that the Court deny the motion of plaintiff James Newman ("Newman") for certification of a class in this action pursuant to Federal Rule Civil Procedure 23(a), and that this case be remanded to state court.[1] Newman filed timely objections to the Report pursuant to Fed.R.Civ.P. 72(b). For the reasons stated below, the Court adopts the Report in its entirety.

### II. STANDARD OF REVIEW

A district court evaluating a Magistrate Judge's report may adopt those portions of the report to which no "specific, written objection" is made, as long as the factual and legal bases supporting the findings and conclusions set forth in those sections are not clearly erroneous. See Fed. R.Civ.P. 72(b); Thomas v. Arn, 474 U.S. 140, 149, 106 S.Ct. 466, 88 L.Ed.2d 435 (1985); Greene v. WCI Holdings Corp., 956 F.Supp. 509, 513 (S.D.N.Y.1997). "Where a party makes a 'specific written objection' within '[ten] days after being served with a copy of the [magistrate judge's] recommended disposition,' however, the district court is required to make a de novo determination regarding those parts of the report." Cespedes v. Coughlin, 956 F.Supp. 454, 463 (S.D.N.Y. 1997) (citing United States v. Raddatz, 447 U.S. 667, 676, 100 S.Ct. 2406, 65 L.Ed.2d 424 (1980)). The Court is not required to review any portion of a Magistrate Judge's report

that is not the subject of an objection. See Thomas, 474 U.S. at 149, 106 S.Ct. 466. A district judge may accept, reject, or modify, in whole or in part, the findings and recommendations of the Magistrate Judge. See DeLuca v. Lord, 858 F.Supp. 1330, 1345 (S.D.N.Y.1994); Walker v. Hood, 679 F.Supp. 372, 374 (S.D.N.Y.1988).

### III. FACTS

The Court finds that the facts set forth in the Report are supported by the record and are thus incorporated herein by reference. Having conducted a review of the factual record, including, among other things, the parties' respective submissions in this action as well as the Report and applicable legal authorities, the Court finds that denial of class certification is warranted in this case.

#### A. Procedural History [2]

Newman seeks certification of a class of individuals who subscribed to certain Internet services of defendants RCN Corporation and RCN Telecom Services, Inc. (collectively, "RCN"). In particular, Newman brings claims on behalf of "all persons or parties who are New York residents who subscribed to defendants' . . . MegaModem Mach 7 service . . . paying therefore and not receiving said service and were bumped up to Mega-Modem Mach 10 service . . . and being charged therefore and not receiving the promised speeds." (Plaintiff's Mem. of Law in Supp. of its Mot. For Class Certification, dated Nov. 29, 2005 ("Class Cert. Mot.") at 1.) He alleges that RCN violated provisions of New York General Business Law § 349 ("GBL § 349").[3] See N.Y. Gen. Bus. L. § 349 (McKinney's 1984).

Plaintiff Newman originally subscribed to RCN's Internet services in late 2003, more specifically to RCN's 3–Megabit Internet

---

1. Newman's claim was removed to this Court pursuant to 28 U.S.C.A. § 1453(b), which provides federal removal jurisdiction for class actions, and thus denial of class certification requires that his action be remanded to state court. See 28 U.S.C.A. § 1453(b); see also Report at 2.

2. The facts set forth below, unless otherwise indicated, derive from the Report and Newman's deposition. (See Report at 1–37; see also Deposi-

tion of James Newman, dated Nov. 21, 2005 ("Newman Dep."), attached as Ex. B to Certification of Anthony X. Arturi, Jr. in Opp. to Mot. to Certify Class, dated Dec. 30, 2005 ("Arturi Cert.").)

3. Newman's original complaint alleged violations of GBL §§ 349 and 350. However, he subsequently dropped his claim with respect to § 350. (See Report at 4.)

service, and was later upgraded to higher speeds by RCN. Newman alleges that during the course of his subscription he observed that his Internet downstream speed was not reaching the level he believed he was promised by RCN.

Newman eventually cancelled his subscription to RCN's Internet services. At his deposition he testified that while he was a subscriber, he paid all of his bills for all RCN services provided him. He alleges that in at least one phone conversation with an RCN representative he complained about the deficient Internet speeds he was receiving, but the exact details of that conversation are unclear from the record.

Newman's complaint centers on the allegation that he and other proposed class members were not receiving Internet service speeds, promised by RCN, for which they were paying. The Report found that class certification is improper here because Newman has failed to satisfy the four requirements for certification set forth in Fed. R.Civ.P. 23(a).

B. *Newman's Objections*

Newman's objections fall into three categories: they address factual matters within the Report, procedural decisions made by the Magistrate Judge regarding discovery disputes, and the legal standards relied upon by the Magistrate Judge in his recommendations. Five factual objections are asserted in Newman's Rule 72(b) submission. (*See* Plaintiff's Objections to the Report and Recommendations of Magistrate Judge Peck, dated Apr. 4, 2006 ("Pl.'s Objections").) First, Newman disputes the Magistrate Judge's findings with regard to the numerosity requirement of Rule 23(a). Second, he challenges the Report's findings with regard to Internet speeds, and asserts that he made a showing that "defendants' speeds, at best, only covered RCN's portion of the [I]nternet and did not cover the [I]nternet areas when the subscribers' requests go beyond RCN's own cables and goes on to those [I]nternet providers with whom RCN has a 'coupling' agreement." (*Id.* at 4.) Third, Newman maintains that the Report ignored his claim that, while he consistently paid his bills, he

did so only because of fear of cancellation of his other services. Fourth, Newman claims that he did demonstrate he had seen some of RCN's advertisements and that he was "orally importuned by an RCN marketer." (*Id.* at 9.) Finally, Newman asserts that RCN's contractual disclaimers were all uniform and that none related to speeds.

Newman asserts three procedural objections. First, he contends that he sought and was denied the opportunity to depose Genine G. Tyson ("Tyson"), an RCN employee he alleges would have knowledge of the company's marketing practices. Second, he challenges the Magistrate Judge's ruling to accept Tyson's affidavit in lieu of allowing her deposition and objects to the use of that affidavit. Third, Newman claims that in the absence of deposition testimony given by Tyson, the Magistrate Judge had "conflicting affidavits" from the parties and therefore should not have relied upon Tyson's affidavit for factual findings. (*Id.* at 4–6.)

Finally, Newman asserts four legal objections. First, he objects to the Magistrate Judge's reliance on *Solomon v. Bell Atlantic Corp.*, 9 A.D.3d 49, 777 N.Y.S.2d 50 (1st Dep't 2004) and argues that the binding authority for reliance questions in relation to New York General Business Law § 349 claims should be *Cox. v. Microsoft Corp.*, 8 A.D.3d 39, 778 N.Y.S.2d 147 (1st Dep't 2004). Second, he asserts that the circumstance that each class member did not view the exact same advertisement in a non-disclosure or omissions case generally would not defeat class certification in this Circuit. (*See* Pl.'s Objections at 8–9 (*citing Green v. Wolf Corp.*, 406 F.2d 291, 301 (2d Cir.1968)).) Third, Newman disputes the Magistrate Judge's finding that he is an atypical plaintiff. He claims that he should not be subject to the voluntary payment doctrine for the reasons described in his factual objections, and that he thus could satisfy the typicality requirement of Rule 23(a). Finally, Newman asserts that the "Magistrate ignored the [C]ourt's power to limit the class claims and class litigation to finite portions of the overall complaint." (*Id.* at 10.)

## IV. *DISCUSSION*

▮ Rule 23(a) sets forth four prongs, all of which must be satisfied, for a class to be certified under the Federal Rules. *See* Fed.R.Civ.P. 23(a). The tests are: (1) numerosity; (2) commonality; (3) typicality; and (4) adequacy and fairness of representation. *See id.* Here, the Court, as was the Magistrate Judge, is most concerned with the typicality requirement, which serves to protect the "absent class members [from the danger that they] will suffer if their representative is preoccupied with defenses unique to [him]." *Gary Plastic Packaging Corp. v. Merrill Lynch, Pierce, Fenner & Smith, Inc.,* 903 F.2d 176, 180 (2d Cir.1990); *see also Baffa v. Donaldson, Lufkin, & Jenrette Sec. Corp.,* 222 F.3d 52, 59–60 (2d Cir.2000). While it has been noted that the unique defenses rule is not "rigidly applied in this Circuit" and that "a representative may satisfy the typicality requirement" and later be barred from recovery based on unique defenses, *In re Frontier Ins. Group, Inc. Sec. Litig.,* 172 F.R.D. 31, 41 (E.D.N.Y.1997), a court reviewing a motion for class certification must consider typicality to ensure that "the representative parties will fairly and adequately protect the interests of the class." Fed.R.Civ.P. 23(a); *accord E. Tex. Motor Freight Sys. Inc. v. Rodriguez,* 431 U.S. 395, 404–05, 97 S.Ct. 1891, 52 L.Ed.2d 453 (1977); *see also Gary Plastic,* 903 F.2d at 180.

Thus in considering Newman's motion, the Court must deny class certification if Newman cannot demonstrate that his interests are sufficiently congruent with those of the class he purports to represent in that he is not subject to unique defenses that threaten to become the focus of the litigation. *See Baffa,* 222 F.3d at 59–60 (noting that class certification is inappropriate where there is a "danger that absent class members will suffer if their representative is preoccupied with defenses unique to [him]."); *accord In re Currency Fee Antitrust Litig.,* 230 F.R.D. 303 (S.D.N.Y.2004).

▮ Under the standard of review applicable to Rule 72(b) objections, therefore, New-man must demonstrate that the Report contains sufficient errors with regard to the typicality prong of Rule 23(a) to justify reconsideration by this Court. Additionally, even if Newman's objections do meet this standard he must also demonstrate reversible error in the Magistrate Judge's findings with regard to commonality.

▮ Newman's claim arises under GBL § 349, which requires that a plaintiff bringing a challenge to a business practice must suffer material injury resulting from the deceptive act that is being challenged. *See* N.Y. Gen. Bus. L. § 349 (McKinney's 1984). "[W]hile the statute does not require proof of justifiable reliance, a plaintiff seeking compensatory damages must show that the defendant engaged in a material deceptive act or practice that caused actual … harm." *Oswego Laborers' Local 214 Pension Fund v. Marine Midland Bank, N.A.,* 85 N.Y.2d 20, 623 N.Y.S.2d 529, 647 N.E.2d 741, 745 (1995). To sustain a claim under GBL § 349, therefore, the alleged deceptive act must be the cause of the harm asserted. Accordingly, for class certification purposes in this case, the deceptive act described in the class description must be the same act that caused the harm to the proposed class representative.

Of the numerous objections Newman presents to the Magistrate Judge's Report, only two affect the Court's analysis of the typicality requirement of Rule 23(a). A finding that Newman is atypical will result in the dispositive conclusion that class certification is inappropriate in this case.[4] The Court, therefore, will analyze only those objections that affect its assessment of whether Newman can satisfy the typicality prong of Rule 23(a). Accordingly, because the Court finds sufficient evidence from Newman's own deposition to establish that he is atypical of the class he seeks to represent, the Court need not address the procedural objections to the Magistrate Judge's findings of fact, nor Newman's assertion that the Magistrate Judge incorrectly applied the voluntary payment doctrine.

---

4. *See* Fed.R.Civ.P. 23(a) (requiring that all four sub-parts, 23(a)(1)—23(a)(4) be met for a class to be certified).

To satisfy the typicality prong and thus warrant class certification, Newman must demonstrate that the alleged harm he suffered under GBL § 349 is the same harm the proposed class is alleged to have suffered. In the instant case Newman has failed to satisfy this requirement. Newman's certification motion describes a class of people who were harmed by RCN because they were induced to subscribe to RCN's Internet service based on allegedly false and/or misleading representations as to the speed of said service. Specifically, Newman "alleges, *inter alia,* that the defendants offered a service, contrary to the advertising and promotional campaign, [that] was generally unavailable." (Class Cert. Mot. at 1.) However, as described below, promised speed was not what induced Newman to switch to RCN's Internet service. Thus, Newman was not harmed by the misrepresentations/omissions he alleges to have injured the class and is atypical of the class in this regard.

Newman's primary determinant for switching Internet service providers and subscribing to RCN's service was that he "felt [he] could save money." (Newman Dep. at 41–43.) When asked if he remembered discussions with RCN, at any point, regarding the speeds of their Internet service, Newman testified that he "remember[ed] absolutely no discussion whatsoever as to speed. Only as to a service package bundle and the price. No mention of speed guarantees or limitations." (*Id.* at 41–42.) When asked what portion of RCN's advertising induced him to contact RCN, Newman replied that he "[didn't] remember exactly what [the competing provider] had, but there were introductory packages that RCN offered that were much cheaper than what [the competing provider] was offering." (*Id.* at 42.) [5]

The proposed class, in contrast, describes individuals who relied upon "defendants' representations as to speed" in their decision to subscribe to the MegaModem Mach 7 service. (Class Cert. Mot. at 3.) Newman is therefore atypical of the proposed class in that the reasons stated in his deposition for subscribing to RCN's Internet services are different from those stated in the class description.

■ Finally, Newman's motion for federal class certification includes a clause in the class description identifying individuals who involuntarily were upgraded from RCN's MegaModem Mach 7 service to MegaModem Mach 10 service. (Class Cert. Mot. at 1.) In his objections, Newman makes reference to the Court's power to certify a class more limited than that proposed in a complaint. If Newman is proposing certification of a narrower class, comprising the individuals described above, the Court must exercise its discretionary power to narrow the class specifically to those individuals. *See* Fed. R.Civ.P. 23(c)(4); *accord Lundquist v. Sec. Pac. Auto. Fin. Servs. Corp.,* 993 F.2d 11, 14–15 (2d Cir.1993) ("The court, however, is not obligated to implement Rule 23(c)(4) on its own initiative.") (*citing U.S. Parole Comm'n v. Geraghty,* 445 U.S. 388, 408, 100 S.Ct. 1202, 63 L.Ed.2d 479 (1980)). Newman's claim, however, centers on misrepresentations about RCN's Internet speeds. Because of Newman's status as atypical of the class in this respect, as described above, the Court elects not to invoke its discretionary authority to narrow the class. Accordingly, the Court does not reach any of Newman's objections which may bear on this portion of the proposed class.

On this analysis, Newman is unlikely to be able to fairly and adequately protect the interests of the proposed class, which consists of those New York residents who subscribed to RCN's MegaModem Mach 7 service on the basis of representations about RCN's Internet speeds. Accordingly, Newman's inability to fulfill the typicality requirement of Rule 23(a) is dispositive and certification of the proposed class is inappropriate.

## V. *ORDER*

For the foregoing reasons, it is hereby

**ORDERED** that the Objections of plaintiff James Newman to the Report and Recom-

---

**5.** Newman briefly makes mention in his deposition that he felt RCN provided speeds comparable to the competition. Newman, however, nei-

ther describes this brief mention as his reason for choosing RCN's service nor proffers any evidence as to how he reached these conclusions.

mendation of Magistrate Judge Andrew Peck, dated April 4, 2006 (Docket No. 48) are rejected; and it is further

**ORDERED** that Newman's motion for class certification is DENIED; and it is finally

**ORDERED** that this action be REMANDED to New York State Supreme Court, New York County.

The Clerk of Court is directed to close this case.

**SO ORDERED:**

### REPORT AND RECOMMENDATION

PECK, United States Magistrate Judge.

Plaintiff James Newman, seeking to represent a class of individuals who subscribed to certain internet services of defendants RCN Corp. and RCN Telecom Services, Inc. (collectively, "RCN"), alleges that RCN violated New York General Business Law §§ 349 and 350 and consequently was unjustly enriched. (Dkt. No. 1: Notice of Removal Ex. A: Compl. ¶¶ 1–14.) Presently before the Court is Newman's motion for class certification of the § 349 claim pursuant to Rule 23 of the Federal Rules of Civil Procedure. (Dkt. No. 17: Newman Class Cert. Motion & Br.; Dkt. No. 35: Newman Class Cert. Reply Papers.) RCN opposes the motion on the grounds that Newman cannot satisfy Rule 23's numerosity, commonality, typicality and predominance requirements. (Dkt. No. 38: 1/16/06 RCN Opp. Br.)

For the reasons set forth below, plaintiff Newman's motion for class certification should be DENIED, and Newman's individual claims accordingly should be remanded to state court.

### FACTS

In April 2005, plaintiff James Newman filed a Class Action Complaint in Supreme Court, New York County. (Dkt. No. 1: Notice of Removal Ex. A: Compl.) On May 18, 2005, RCN filed a "Notice of Removal of Class Action Pursuant to 28 U.S.C. § 1453"

in this District. (Dkt. No. 1.) On June 15, 2005, RCN answered the complaint. (Dkt. No. 4: Ans.)

### The Allegations in Plaintiff's Class Action Complaint [1]

Defendant RCN Corp. is a Delaware corporation, and defendant RCN Telecom Services, Inc. is a Pennsylvania corporation that is a wholly owned subsidiary of RCN Corp. (Compl. ¶¶ 2–3.) RCN offers, *inter alia*, internet services to customers in New York. (*Id.*)

Since November 2003, Newman, a New York resident, has been an RCN subscriber. (Coml. ¶ 1.) Newman received many advertisements for RCN's internet services via the internet and United States mail. (*Id.*) "Pursuant to defendants' advertising and promotional campaign, plaintiff subscribed to defendants' basic internet service for $39.95 per month." (*Id.* ¶ 4.) Thereafter, RCN developed an improved premium internet service titled Mega Modem Mach 7 ("Mach 7"), which RCN advertised throughout New York as being considerably faster than its basic internet service. (*Id.* ¶¶ 5–6.) "[W]ithout authorization or consent, defendants charged plaintiff for Mach 7 premium service," although he had initially subscribed to RCN's basic internet service. (*Id.* ¶ 5.) Newman had to pay an additional $25 per month for the Mach 7 service. (*Id.* ¶ 7.) RCN knew "that the use of Mach 7 was unavailable during normal hours of the day and could only be obtained at unusual times in early morning, when the internet was not being used by other subscribers of RCN." (*Id.* ¶ 8.) Therefore, Newman and other members of the class were paying extra for a service that was no faster than RCN's basic internet service. (*Id.*)

RCN thereafter developed an even faster internet service entitled Mega Modem Mach 10 ("Mach 10"). (Compl. ¶ 9.) In March 2005, RCN automatically upgraded Newman and "other members of the Class" to the Mach 10 service, which increased the bill by an additional $25 per month. (*Id.*) "Plaintiff and the

---

1. The Court summarizes the allegations in the Class Action Complaint (hereafter, the "complaint" or "Compl.") (Dkt. No. 1: Notice of Removal Ex. A), without use of the introductory phrase, "Plaintiff alleges."

other members of the Class who were subscribers to the Mach 7 did not agree, or consent to the 'bump up' and the additional charges. They were content with the normal download service and did not wish or agree to the Mach 10 premium service." (*Id.*) Newman and the other class members have wrongfully paid RCN "thousands and thousands" of dollars. (*Id.* ¶ 10.)

Plaintiff claims that RCN's "conduct violated §§ 349 and 350 of the General Business Law in that it offered a service, contrary to the advertising and promotional campaign, [that] was generally unavailable and, in addition, caused subscribers to pay for additional service without obtaining their consent thereto." (Compl.¶ 12.) Additionally, Newman claims that "defendants have been unjustly enriched through the receipt of such monies and subscription fees for services which were not obtainable at normal times, nor consented to." (*Id.* ¶ 14.)

The complaint defines the class as Newman "and all other New York residents who subscribed to defendants' Mach 7 service, paying therefor and not receiving said service and were bumped up to Mach 10 service and being charged therefor without their expressed consent thereto." (Compl.¶ 15.) "The Class seeks damages for violations of §§ 349 and 350 of the General Business Law, and for violations of the duty of good faith and fair dealing and for unjust enrichment." (*Id.* ¶ 16.) Newman subsequently, however, dropped his class claim under General Business Law § 350, retaining only the § 349 claim on a class basis. (Dkt. No. 35: Newman Class Cert. Reply Br. at 2.)

### RCN's Affidavits

#### RCN's General Pricing and Billing Policies

"RCN provides telephone, cable television and high speed internet connectivity (through a cable modem network) to customers in the New York City market...." (Dkt. No. 39: Tyson Aff. ¶ 2.) RCN offers promotional pricing packages called "bundles," which enable RCN customers who order multiple services (internet, cable television, telephone) to save money by purchasing these services together instead of paying for each service separately. (*Id.* ¶¶ 6–7.) RCN's policy "is that if a customer who subscribes to a bundle later cancels one of the bundled services, the customer is still responsible to pay RCN for the remaining services at the regular, non-discounted rates." (*Id.* ¶ 9.) RCN's promotional mailers advertising the "Resilink Gold" bundle (described below), for example, specified that "[i]f a portion of the package is canceled (by customer voluntarily or due to non-payment) remaining service charges will revert to a la carte rates." (*Id.* ¶ 9 & Ex. D at RCN5073, RCN5075, RCN5077.)

RCN bills its customers for all services in advance, which "means that a customer's billing statement is sent and received prior to RCN providing the particular services identified therein, and prior to the time for which the customer is obligated to make payment." (Tyson Aff. ¶ 11.) This procedure gives customers an opportunity to review their bills in advance and to dispute any questionable charges or change any service prior to making payment. (*Id.* ¶ 14.)

#### RCN's Internet Service Network

RCN's internet service network is designed to act as a large "pipeline" for the information sent and received by RCN's customers. (Dkt. No. 41: Laird Aff. ¶ 34.) "That pipeline is designed to transfer up to 40 megabits per second (mbps) of aggregated data being sent to or from RCN subscribers in a geographical location." (*Id.* ¶ 35.) "However, in order to maintain availability of the pipeline to its subscribers, RCN electronically limits the amount of information that any individual subscriber's cable modem can place on the RCN network at any precise point in time." (*Id.* ¶ 36.) "At the present time RCN's limit is 7 megabits per second (mbps) downstream (from the internet user to the RCN user) for subscribers to RCN's Megamodem Mach 7 service. Subscribers to RCN's Megamodem Mach 10 service are limited to 10 mbps downstream." (*Id.* ¶ 37.)

In addition to the limitations that RCN places on its customers, there are myriad other factors that can affect internet speed. (Laird Aff. ¶¶ 12, 59–81.) Those factors include: "(a) hardware and software configuration for each particular subscriber; (b) the

CPU speed of the subscriber's computer; (c) the overall condition of the internet on any given day and at any given time; (d) the capacity of the website that a subscriber seeks to visit; and (e) how many other people are attempting to access a particular website at the same time as an RCN subscriber." (*Id.* ¶ 81.) In order to determine why an RCN subscriber experienced slower internet service, each of these factors would have to be examined. (*Id.* ¶ 83.) According to RCN's Mr. Laird: "RCN's monitoring of its pipeline demonstrates that there was always sufficient capacity for its subscribers to send and receive data through it and across the internet. The RCN network has more than adequate capacity it needs to provide users of Megamodem Mach 7 and Mach 10 service with the maximum available speed to which they subscribe." (*Id.* ¶¶ 91–92.)

### James Newman's RCN Subscription History

Plaintiff James Newman initially subscribed to RCN's services by subscribing to the "Resilink Gold" bundle on October 31, 2003. (Dkt. No. 39: Tyson Aff. ¶ 18 & Ex. A at RCN0001–0002.) The Resilink Gold bundle included cable television, telephone, and high speed cable modem internet service. (Tyson Aff. ¶ 19.) The Resilink Gold bundle automatically provided subscribers with RCN's best possible internet speed, "so that whatever was RCN's fastest cable modem service available to subscribers at any particular time, a Resilink Gold subscriber received that premium service over RCN's basic internet service, and received that premium service for no additional charge over the cost of the basic service." (*Id.* ¶ 20.)

Upon subscribing to RCN's Resilink Gold bundle on October 31, 2003, Newman signed and received a copy of a work order, the back of which contained a list of "Terms and Conditions" regarding RCN's services. (Tyson Aff. ¶¶ 18, 21–28 & Ex. A at RCN0002.) The Terms and Conditions on the work order included a paragraph regarding customer payment:

3. Payment of Charges: Customer will be billed monthly in advance for services to be received, plus pro-rata charges, if any, for periods not previously billed. . . . Customer must pay all undisputed monthly charges as itemized on the RCN monthly invoice and/or notify RCN of disputed items within thirty (30) days of receipt or such other amount of time as is prescribed by law. . . . Subject to applicable law, RCN shall issue a credit or refund for any billing error that is brought to its attention by Customer within sixty (60) days of bill.

(Tyson Aff. ¶ 26 & Ex. A at RCN0002 ¶ 3.) The Terms and Conditions also specified that "[r]ates for . . . programming or other services are subject to change in accordance with applicable law." (Tyson Aff. ¶ 27 & Ex. A at RCN 0002 ¶ 18.) The Terms and Conditions also incorporated certain other RCN agreements that were located on RCN's website: the RCN Internet Access Agreement, the Internet Customer Guide, the RCN Acceptable Use Policy, and the RCN High Speed Cable Modem Service Addendum, all of which contained additional terms and conditions relating to RCN's services, including RCN's right to change its fees upon notice to the customer. (Tyson Aff. ¶¶ 28–32 & Exs. A, B, C.)

As of October 31, 2003, when Newman initially subscribed to Resilink Gold, RCN's "premium" internet service was Mach 3, which "afforded users up to 3 megabits per second of data transfer over RCN's internet network." (Tyson Aff. ¶ 36.) Newman received Mach 3 services as part of the Resilink Gold bundle for no additional charge over RCN's lower speed internet service. (*Id.* ¶ 37.) "The price initially paid by Plaintiff for Mach 3 service, ($25.48) was the price charged by RCN for its lower speed internet service to customers not within an eligible bundle." (*Id.* ¶ 37 & Ex. E at RCN2091.)

On January 1, 2004, RCN upgraded its premium service to "Mach 5," with an upgraded speed of 5 megabits per second. (Tyson Aff. ¶ 38.) RCN designated Mach 3 service as its basic service at a charge of $25.48 per month. (*Id.* ¶ 39.) Resilink Gold subscribers, including Newman, automatically received Mach 5 service at no extra charge over the previous charge of $25.48 per month. (*Id.* ¶ 40 & Ex. F at RCN2083.) Newman continued to pay his monthly RCN

bill without inquiry for the next four months. (Tyson Aff. ¶ 41.)

On May 1, 2004, RCN increased its rate for Mach 3 service to $35.29 per month. (Tyson Aff. ¶ 42.) As a result, RCN billed Newman $35.29 per month for Mach 3 service, and because he was a Resilink Gold bundle subscriber, he received Mach 5 service at no extra charge. (*Id.* ¶ 43 & Ex. G at RCN2067.) Newman continued to pay his monthly RCN bill without complaint to RCN. (Tyson Aff. ¶ 44.)

On September 1, 2004, RCN upgraded its premium service to "Mach 7," with an upgraded speed of 7 megabits per second. (Tyson Aff. ¶ 45.) RCN designated Mach 5 service as its basic service at a charge of $35.29 per month. (*Id.* ¶ 46.) Resilink Gold subscribers, including Newman, automatically received Mach 7 service at no extra charge over the previous charge of $35.29 per month. (*Id.* ¶¶ 47–48 & Ex. H at RCN2050.) Newman paid his September, October and November 2004 RCN bills without dispute. (Tyson Aff. ¶¶ 49–57.) The October and November 2004 bills contained prominent notations on the first page that read: "With your ResiLink Gold bundle, *you saved $32.00* this month compared to buying these services separately!" (Tyson Aff. Ex. I at RCN2001; Tyson Aff. Ex. J at RCN2006; Tyson Aff. ¶ 50, 55.)

On November 4, 2004, "Plaintiff voluntarily discontinued his Resilink Gold bundle, by canceling RCN's telephone service and switching to another telephone provider." (Tyson Aff. ¶ 58.) After this, RCN billed Newman for his remaining cable television and high speed internet services based on a la carte pricing. (*Id.* ¶¶ 59–60.)

In November 2004, RCN sent Newman his December 2004 statement for high speed internet and cable television services. (Tyson Aff. ¶ 61 & Ex. M.) This statement charged Newman based on a la carte pricing, including $39.95 for Mach 5 high speed internet service as well as $25.00 for an upgrade to Mach 7 internet service. (Tyson Aff. ¶¶ 64–66 & Ex. M at RCN2014.) This statement also omitted the notation regarding Resilink Gold bundle savings that had appeared on Newman's previous bills. (Tyson Aff. ¶ 62 & Ex. M at RCN2012.) Newman did not dispute the charges in the December 2004 statement and paid it in full. (Tyson Aff. ¶¶ 71, 73.) However, Newman contacted RCN on December 8, 2004 to ask what the difference was between Mach 5 and Mach 7 internet service. (*Id.* ¶ 72 & Ex. L at RCN0023.)

In December 2004, RCN sent Newman his January 2005 statement for high speed internet and cable television services. (Tyson Aff. ¶ 74 & Ex. N.) This statement again charged Newman based on a la carte pricing, including $39.95 for Mach 5 internet service as well as $25.00 for an upgrade to Mach 7 internet service. (Tyson Aff. ¶¶ 76–77 & Ex. N at RCN2018.) This statement also did not contain the notation regarding Resilink Gold bundle savings that had appeared on Newman's earlier bills. (Tyson Aff. ¶ 75 & Ex. N at RCN2016.) Newman did not dispute the charges in his January 2005 bill and paid the bill in full. (Tyson Aff. ¶¶ 80–82.)

In January 2005, RCN sent Newman his February 2005 statement for high speed internet and cable television services. (Tyson Aff. ¶ 83 & Ex. O.) This statement mirrored the January 2005 statement with regard to pricing, services and the lack of notation regarding Resilink Gold bundle savings. (Tyson Aff. ¶¶ 84–86 & Ex. O at RCN2020, RCN2022.) Newman did not dispute the charges in the February 2005 bill and paid the bill in full. (Tyson Aff. ¶¶ 88–89.)

In February 2005, RCN sent Newman his March 2005 statement for high speed internet and cable television services. (*Id.* ¶ 90 & Ex. P.) The rates that RCN charged were the same rates as in the previous bills, $39.95 for basic internet service and $25.00 for premium internet service. (Tyson Aff. ¶ 93 & Ex. P at RCN2025.) However, on March 1, 2005, RCN upgraded its basic internet service to Mach 7 and its premium service to Mach 10, which provided customers with a speed of up to 10 megabits per second of data transfer. (Tyson Aff. ¶¶ 94–95.) Therefore, Newman's March 2005 bill charged him $39.95 for Mach 7 service and $25.00 more for Mach 10 service. (*Id.* ¶ 97 & Ex. P at RCN2025.) Several weeks after Newman received his March 2005 statement,

on March 16, 2005 he called RCN and subscribed to an RCN bundle called "Power/CI," which included cable television and premium Mach 10 internet service. (Tyson Aff. ¶¶ 102–03 & Ex. R at RCN2029.) By subscribing to this bundle, Newman saved $30.70 per month compared to what he was paying for these services a la carte. (Tyson Aff. ¶ 103 & Ex. R at RCN2027.) RCN gave Newman a credit for half the month of March 2005 for the Mach 7 and Mach 10 internet charges. (Tyson Aff. ¶ 104 & Ex. R at RCN2029.) From March 16, 2005 on, Newman has subscribed to RCN's "Power/CI" bundle. (*Id.* ¶ 105.)

### Other RCN Customers Who Were Billed On An A La Carte Basis

According to RCN's customer records, from November 2004 through March 2005, the number of RCN "[c]ustomers who switched to a la carte pricing of premium high speed internet access by dropping telephone service" was between thirteen and thirty customers per month. (Dkt. No. 40: Cherniavsky Aff. ¶ 4 & Ex. A: Subscriber Chart.) For that entire period, only a total of 15 customers (at the rate of 2–4 per month) downgraded their internet service to avoid a la carte charges. (*Id.*)

### Plaintiff James Newman's Deposition

On November 17, 2005, RCN took the deposition of plaintiff James Newman. (Dkt. No. 26: Arturi Aff. Ex. B: Newman Dep.) Newman testified that he owns his own company, Ramben Group, which "tracks class action litigation in the stock market, securities litigation, and helps investors make sure they get everything they are entitled to."[2] (Newman Dep. at 26.) Newman said that he originally sought a lawyer to bring a class action lawsuit against RCN because he believed that RCN was charging him for services that he was not receiving and for services that he did not order. (*Id.* at 13–14.)

Newman originally contacted RCN to become a subscriber in response to an advertisement, although he could not remember exactly what the advertisement said, and he did not have a copy of that particular advertisement. (Newman Dep. at 42, 129.) Newman was interested in RCN service because it was cheaper than Time Warner. (*Id.* at 42–43.) Newman remembered receiving "dozens" of RCN advertisements in the mail prior to subscribing, and that when he actually decided to subscribe to RCN service, he called to inquire about RCN's available packages. (*Id.* at 129–30.) No one particular advertisement influenced Newman to sign up for RCN service, and he did not remember the contents of any particular RCN advertisements that he received in 2003. (*Id.* at 130–32.) Newman never noticed any restrictions on any of the advertisements that he received. (*Id.* at 132–35.) Newman subscribed by contacting a telephone representative at RCN. (*Id.* at 42–44, 131.) He had no discussion as to speed. (*Id.* at 41–42.) Newman did not remember to which RCN package he initially subscribed when he first became an RCN customer, although he believed that it was a bundled package that included cable television and internet and also probably telephone service. (*Id.* at 44–45, 48, 98, 102–03.)

Newman believed that when he first signed up for service, he would receive an initial discounted rate, which would eventually be "bumped up" to a regular rate. (*Id.* at 45–46.) Newman understood that if he did not buy all three services together as a bundle, the price of each service would be slightly higher if he were paying for each of them a la carte. (*Id.* at 142.) Newman understood that RCN could change its rates as long as it notified customers in advance. (*Id.* at 142–43.) Newman knew that he had the right to discontinue his service at any time. (*Id.* at 143.)

On October 31, 2003, RCN initially installed Newman's service. (Newman Dep. at 49.) Newman signed a work order, but did not read the "Terms and Conditions" on the reverse side. (*Id.* at 50–52.) Newman did not

---

2. Prior to Ramben Group, Newman published a newsletter entitled "Securities Class Action Alert," which compiled information for institutions and investors regarding securities class action settlements. (Newman Dep. at 28–29.) Approximately fifteen years ago, Newman himself was a plaintiff in a class action lawsuit in California against MBNA, alleging overcharging of fees. (*Id.* at 9–10.) Newman eventually voluntarily dismissed that case after an adverse ruling in a similar case by the U.S. Supreme Court. (*Id.* at 11–12.)

recall how fast his initial RCN internet service was. (*Id.* at 111.)

Throughout the deposition, Newman had very little recollection of any details about his RCN bills. (*See generally* Newman Dep. at 120–271.) Newman did not usually review his RCN bills every month, but would "glance at them to see if the numbers were similar to previous month's." (*Id.* at 15–16, 96–97.) Newman paid all of his monthly RCN bills in full since he became a subscriber in October 2003. (*Id.* at 97.) Newman did not believe that he ever called RCN to dispute any portion of his bills. (*Id.* at 114–15.)[3] At some point, Newman asked RCN about a $5 monthly charge for the cable modem, and an RCN representative told him that he could eliminate that charge if he purchased his own cable modem. (*Id.* at 115.) Approximately a month after the call, Newman purchased his own cable modem to use with RCN's service. (*Id.* at 115–16.) According to an RCN work order signed by Newman dated September 21, 2004, Newman turned in the RCN-supplied cable modem and began using RCN internet services with a cable modem that he purchased himself. (*Id.* at 118–19, 121–22.) Newman did not read the "Terms and Conditions" on the back of the RCN work order. (*Id.* at 120.)

Newman noticed fluctuations in his internet speed: during the day, the internet would be very slow, but early in the morning or late at night, he would not experience those problems. (Newman Dep. at 32–33.) Newman learned from his son, who is a computer programmer at Microsoft, that internet speed depends on amount of bandwidth available, how many users are on the internet at the same time, and the web sites that the user is accessing. (*Id.* at 33–34, 249–52.) Newman testified that what he minded was "paying . . . an extra charge," not the fluctuations in available speed itself. (*Id.* at 252.)

In November 2004, Newman decided to discontinue his RCN telephone service because he wanted to switch to another tele-phone service provider, Vonage. (Newman Dep. at 148, 153.)

Newman testified that he believed that, "[a]t some point in time," he called RCN to dispute the extra charge for Mach 7 service that appeared on his December 2004 bill. (Newman Dep. at 160–68.) Newman was not sure whether he requested that his Mach 7 service be discontinued during that call. (*Id.* at 168–69.) Sometime during 2005, an RCN representative called Newman and told him that RCN could save him money if he switched to a different package. (*Id.* at 164.) While on that phone call, Newman believes that he disputed the extra charge for Mach 10 service. (*Id.* at 164–65.)

Newman could not recall any particular advertisement regarding the promised speed of the Mach 7 and Mach 10 services, although he remembered looking on the RCN web site and at fliers that he received in the mail for information on the Mach 7 and Mach 10 services. (Newman Dep. at 229.) Newman's March 2005 bill contained a notation stating that "MegaModem Mach 10 is here! The FASTEST residential Internet service available with download speeds up to 10 Mbps. It's RCN's new, supercharged High-Speed Internet service that lets you download huge files like photos, music, and games in seconds. Get it for just $25 a month or get it FREE when you upgrade to one of RCN's qualifying Bundle Packages." (Arturi 2/8/06 Supp. Aff. Ex. B: Newman Dep. Ex. D–16.) Newman contends that this is one of the misrepresentations that RCN made about the speed of its internet service. (Newman Dep. at 229.)

Newman testified that none of the fliers that he received in the mail induced him to pay for RCN premium internet service because he never wanted the faster speed in the first place. (Newman Dep. at 233.) Newman stated that he tested whether he received 7 Mbps per second, but did not test whether he received 10 Mbps when he was paying for the Mach 10 service. (*Id.* at 234.)

Newman performed two internet speed tests on December 16, 2004, which showed that his internet speed was approximately 5

---

**3.** Sometime during 2004, Newman called RCN to ask RCN why he was being charged twice for a digital converter, and an RCN representative explained that it was because he had two digital converter units in his house. (*Id.*)

megabits per second. (Newman Dep. at 254–55; Newman Dep. Ex. D–19 at NEWMAN00003–00008.) This test was done at the time that Newman was using the modem that he purchased himself; Newman did not know what internet speed he had when he was using the RCN-supplied modem that he previously had used. (Newman Dep. at 259.) Newman testified that sometimes he would experience slow responses on the internet during normal working hours, but the response times would be better when he went on the internet at "oddball hours." (*Id.* at 260.) Newman did not have any written records of any other tests that he did, aside from the tests on December 16, 2004. (*Id.* at 261.) Newman did not know exactly how those tests were done. (*Id.* at 262.) Newman only tested the internet speeds in his house, and he was unaware of what internet speeds any other RCN subscribers experienced during the same time frame. (*Id.* at 263–64.)

Newman used two different Dell computers while he was an RCN subscriber. (Newman Dep. at 241.) Newman did not know the processor speed of the first computer, although he knew that he bought it during 2000–2001. (*Id.* at 241–42.) Newman did not know what kind of ethernet card he used with his internet service with that first computer (*id.* at 242–43), and did not know any of the technical specifications for that first computer (*id.* at 244–45). Newman purchased his second computer around the end of 2003 or the beginning of 2004. (*Id.* at 245.) Newman did not know any of the technical specifications for that second computer. (*Id.* at 246.)

### ANALYSIS

### CLASS CERTIFICATION SHOULD BE DENIED

▉ The Second Circuit requires a liberal, rather than restrictive, interpretation of Rule 23 of the Federal Rules of Civil Procedure. *See, e.g., Marisol A. v. Giuliani,* 126 F.3d 372, 377 (2d Cir.1997) (" 'Rule 23 is given liberal rather than restrictive construction, and courts are to adopt a standard of flexibility . . . .' ").[4] Nevertheless, district courts must undertake a "rigorous analysis" to ensure that Rule 23's requirements have been satisfied. *Gen. Tel. Co. of the Sw. v. Falcon,* 457 U.S. 147, 161, 102 S.Ct. 2364, 2372, 72 L.Ed.2d 740 (1982); *accord, e.g., Heerwagen v. Clear Channel Commc'ns,* 435 F.3d 219, 225 (2d Cir.2006); *In re Visa Check/Master-Money Antitrust Litig.,* 280 F.3d 124, 134–35 (2d Cir.2001), *cert. denied,* 536 U.S. 917, 122 S.Ct. 2382, 153 L.Ed.2d 201 (2002); *In re NTL, Inc. Sec. Litig.,* 2006 WL 330113 at *4; *Fogarazzo v. Lehman Bros., Inc.,* 232 F.R.D. at 179.

▉ "In ruling on class certification, a district court may not simply accept the allegations of plaintiffs' complaint as true." *Fogarazzo v. Lehman Bros., Inc.,* 232 F.R.D. at 179.[5] "[S]ometimes it may be necessary for the court to probe behind the pleadings before coming to rest on the certification question." *Gen. Tel. Co. v. Falcon,* 457 U.S. at 160, 102 S.Ct. at 2372.[6] "In deciding a certification motion, district courts must not consider or resolve the merits of the claims of the purported class." *Caridad v. Metro-North Commuter R.R.,* 191 F.3d 283, 293 (2d Cir.1999) (citing *Eisen v. Carlisle & Jacquelin,* 417 U.S. 156, 177, 94 S.Ct. 2140, 2152, 40 L.Ed.2d 732 (1974)), *cert. denied,* 529 U.S. 1107, 120 S.Ct. 1959, 146 L.Ed.2d 791 (2000); *accord, e.g., Heerwagen v. Clear Channel Commc'ns,* 435 F.3d at 225; *Baffa v. Donaldson, Lufkin & Jenrette Sec. Corp.,* 222 F.3d 52, 58 (2d Cir.2000); *In re NTL, Inc. Sec. Litig.,* 2006 WL 330113 at *4; *In re Initial Pub. Offering Sec. Litig.,* 227 F.R.D. at 93;

---

4. *Accord, e.g., In re NTL, Inc. Sec. Litig.,* 02 Civ. 3013, 2006 WL 330113 at *4 (S.D.N.Y. Feb.14, 2006) (Peck, M.J.); *In re Natural Gas Commodities Litig.,* 231 F.R.D. 171, 178 (S.D.N.Y.2005); *Fogarazzo v. Lehman Bros., Inc.,* 232 F.R.D. 176, 178–79 (S.D.N.Y.2005); *In re Initial Pub. Offering Sec. Litig.,* 227 F.R.D. 65, 90 (S.D.N.Y.2004); *In re Towers Fin. Corp. Noteholders Litig.,* 177 F.R.D. 167 (S.D.N.Y.1997) (Knapp, D.J. & Peck, M.J.); 5 *Moore's Federal Practice* § 23.03 (2005).

5. *Accord, e.g., In re NTL, Inc. Sec. Litig.,* 2006 WL 330113 at *4; *In re Initial Pub. Offering Sec. Litig.,* 227 F.R.D. at 91–93.

6. *Accord, e.g., In re NTL, Inc. Sec. Litig.,* 2006 WL 330113 at *4; *Fogarazzo v. Lehman Bros., Inc.,* 232 F.R.D. at 179; *In re Initial Pub. Offering Sec. Litig.,* 227 F.R.D. at 91.

*Bolanos v. Norwegian Cruise Lines Ltd.*, 212 F.R.D. 144, 154–55 (S.D.N.Y.2002) (Berman, D.J. & Peck, M.J.). "In order to pass muster, plaintiffs—who have the burden of proof at class certification—must make *'some showing'* [that the class comports with Rule 23]. That showing may take the form of, for example, expert opinions, evidence (by document, affidavit, live testimony, or otherwise), or the uncontested allegations of the complaint." *In re Initial Pub. Offering Sec. Litig.*, 227 F.R.D. at 93; *accord, e.g., Heerwagen v. Clear Channel Commc'ns*, 435 F.3d at 231; *In re NTL, Inc. Sec. Litig.*, 2006 WL 330113 at *4; *Fogarazzo v. Lehman Bros., Inc.*, 232 F.R.D. at 179.

## A. The Requirements of Rule 23(a)

Rule 23(a) sets forth the requirements for class certification: "One or more members of a class may sue or be sued as representative parties on behalf of all only if (1) the class is so numerous that joinder of all members is impracticable, (2) there are questions of law or fact common to the class, (3) the claims ... of the representative parties are typical of the claims ... of the class, and (4) the representative parties will fairly and adequately protect the interests of the class." Fed.R.Civ.P. 23(a).[7] "A class must satisfy all four requirements [of Rule 23(a) ] before it may be certified under Rule 23." 5 *Moore's Federal Practice* § 23.20 at 23–46 (2005); *accord, e.g., In re NTL, Inc. Sec. Litig.*, 2006 WL 330113 at *5.

7. *See generally, e.g., In re Visa Check/MasterMoney Antitrust Litig.*, 280 F.3d 124, 132–33 (2d Cir.2001), *cert. denied*, 536 U.S. 917, 122 S.Ct. 2382, 153 L.Ed.2d 201 (2002); *Robinson v. Metro–North Commuter R.R.*, 267 F.3d 147, 155–56 & n. 1 (2d Cir.2001), *cert. denied*, 535 U.S. 951, 122 S.Ct. 1349, 152 L.Ed.2d 251 (2002); *Caridad v. Metro–North Commuter R.R.*, 191 F.3d 283, 291 (2d Cir.1999), *cert. denied*, 529 U.S. 1107, 120 S.Ct. 1959, 146 L.Ed.2d 791 (2000); *Marisol A. v. Giuliani*, 126 F.3d 372, 375–76 & n. 3 (2d Cir.1997); *In re NTL, Inc. Sec. Litig.*, 02 Civ. 3013, 2006 WL 330113 at *5 (S.D.N.Y. Feb.14, 2006) (Peck, M.J.); *Bolanos v. Norwegian Cruise Lines Ltd.*, 212 F.R.D. 144, 152 (S.D.N.Y.2002) (Berman, D.J. & Peck, M.J.); *In re Towers Fin. Corp. Noteholders Litig.*, 177 F.R.D. 167, 169 (S.D.N.Y.1997) (Knapp, D.J. & Peck, M.J.).

8. *Accord, e.g., In re NTL, Inc. Sec. Litig.*, 02 Civ. 3013, 2006 WL 330113 at *5 (S.D.N.Y. Feb.14,

## 1. Numerosity

■ Rule 23(a) requires that the class be "so numerous that joinder of all members is impracticable." Fed.R.Civ.P. 23(a)(1). "[J]oinder of all members need not be impossible, but only impracticable in the sense that joinder would 'needlessly complicate and hinder efficient resolution of the litigation.' " *In re Avon Sec. Litig.*, 91 Civ. 2287, 1998 WL 834366 at *5 (S.D.N.Y. Nov.30, 1998).[8]

■ "Although precise calculation of the number of class members is not required, and it is permissible for the court to rely on reasonable inferences drawn from available facts, numbers in excess of forty generally satisfy the numerosity requirement." *Fogarazzo v. Lehman Bros., Inc.*, 232 F.R.D. at 179; *see, e.g., Marisol A. v. Giuliani*, 126 F.3d 372, 376 (2d Cir.1997); *Consol. Rail Corp. v. Town of Hyde Park*, 47 F.3d 473, 483 (2d Cir.) ("numerosity is presumed at a level of 40 members"), *cert. denied*, 515 U.S. 1122, 115 S.Ct. 2277, 132 L.Ed.2d 281 (1995); *Korn v. Franchard Corp.*, 456 F.2d 1206, 1209 (2d Cir.1972).[9]

■ Newman asserts, without any record citation, that his claims have met the numerosity requirement because "there are 40,000—60,000 subscribers to defendants' bundled services in the New York area." (Dkt. No. 17: Newman Class Cert. Br. at 6; *id.* at 2–3.) However, defendants claim that plaintiff has greatly exaggerated RCN's subscrib-

2006) (Peck, M.J.); *Fogarazzo v. Lehman Bros., Inc.*, 232 F.R.D. 176, 179 (S.D.N.Y.2005); *In re Indep. Energy Holdings PLC Sec. Litig.*, 210 F.R.D. 476, 479 (S.D.N.Y.2002); *see generally* 5 *Moore's Federal Practice* § 23.22[1].

9. *See also, e.g., In re NTL, Inc. Sec. Litig.*, 2006 WL 330113 at *5; *The Presbyterian Church v. Talisman Energy, Inc.*, 226 F.R.D. 456, 466 (S.D.N.Y.2005) ("Numerosity is presumed when a class consists of forty or more members."); *In re Avon Sec. Litig.*, 1998 WL 834366 at *5 ("In general, 'numbers in excess of forty, particularly those exceeding one hundred or one thousand have sustained the requirement.' "); *In re Towers Fin. Corp. Noteholders Litig.*, 177 F.R.D. 167, 170 (S.D.N.Y.1997) (Knapp, D.J. & Peck, M.J.) (certifying class of "several thousand investors"); *Trief v. Dun & Bradstreet Corp.*, 144 F.R.D. 193, 198 (S.D.N.Y.1992); 5 *Moore's Federal Practice* § 23.22[1][b].

er numbers. (*See* Dkt. No. 38: 1/16/06 RCN Opp. Br. at 36–37; Dkt. No. 40: Cherniavsky Aff. & Ex. A: Subscriber Chart.) With respect to Newman's claim that subscribers to RCN's premium high speed internet service were paying for a higher speed than they were receiving, RCN contends that the appropriate class of subscribers consists of those people who paid an additional charge for the premium high speed internet service (those who subscribed to a bundle received the higher speed service for no additional cost). According to RCN's affidavits, the number of "[t]otal customers who had premium high speed internet service and paid [an] additional premium charge" was between 1,134 and 2,134 subscribers during the October 2003 to June 2005 time period. (Cherniavsky Aff. Ex. A: Subscriber Chart.) Because even RCN's figures clearly are over forty, Newman has demonstrated numerosity for his claim that subscribers to RCN's premium high speed internet service were paying for a higher speed than they were actually receiving.

 With respect to Newman's claim that RCN caused subscribers to pay for higher speed service without obtaining their prior consent, the appropriate class of subscribers consists of those people who unbundled and were subsequently charged extra for premium high speed internet service. According to RCN, "at most, there are only between 10 and 17 subscribers in the months that Plaintiff was charged who could ever be similarly situated to him with regard to the $25.00 'a la carte' charges." (1/16/06 RCN Opp. Br. at 37; *see also* Cherniavsky Aff. Ex.

A: Subscriber Chart.) Even at 10–17 people per month, the Court assumes they were different people each month, and thus Newman (barely) has satisfied the numerosity requirement for his claim that RCN caused subscribers to pay for additional high speed internet service without obtaining their prior consent.

### 2. Commonality and Predominance

 Commonality requires a showing that "there are questions of law or fact common to the class." Fed.R.Civ.P. 23(a)(2). " 'The commonality requirement is met if plaintiffs' grievances share a common question of law or of fact.' " *Robinson v. Metro– North Commuter R.R.*, 267 F.3d 147, 155 (2d Cir.2001) (quoting *Marisol A. v. Giuliani*, 126 F.3d 372, 376 (2d Cir.1997)), *cert. denied*, 535 U.S. 951, 122 S.Ct. 1349, 152 L.Ed.2d 251 (2002).[10] This requisite "does not mean that all issues must be identical as to each member, but it does require that plaintiffs identify some unifying thread among the members' claims that warrants class treatment." *Kamean v. Local 363, Int'l Bhd. of Teamsters*, 109 F.R.D. 391, 394 (S.D.N.Y.), *appeal dismissed*, 833 F.2d 1002 (2d Cir.1986), *cert. denied*, 481 U.S. 1024, 107 S.Ct. 1911, 95 L.Ed.2d 517 (1987).[11] The "commonality requirement [is] satisfied if the class shares even one common question of law or fact," and "factual differences in the claims of the class do not preclude a finding of commonality." 5 *Moore's Federal Practice* § 23.23[2]; *accord, e.g., Bolanos v. Norwegian Cruise Lines Ltd.*, 212 F.R.D. at 153.[12]

---

**10.** *See also, e.g., In re Agent Orange Prod. Liab. Litig.*, 818 F.2d 145, 166–67 (2d Cir.1987), *cert. denied*, 484 U.S. 1004, 108 S.Ct. 695, 98 L.Ed.2d 648 (1988); *In re NTL, Inc. Sec. Litig.*, 02 Civ. 3013, 2006 WL 330113 at *6 (S.D.N.Y. Feb.14, 2006) (Peck, M.J.); *Bolanos v. Norwegian Cruise Lines Ltd.*, 212 F.R.D. 144, 153 (S.D.N.Y.2002) (Berman, D.J. & Peck, M.J.); *In re Towers Fin. Corp. Noteholders Litig.*, 177 F.R.D. 167, 170 (S.D.N.Y.1997) (Knapp, D.J. & Peck, M.J.).

**11.** *Accord, e.g., In re NTL, Inc. Sec. Litig.*, 2006 WL 330113 at *6; *Bolanos v. Norwegian Cruise Lines Ltd.*, 212 F.R.D. at 153; *In re Towers Fin. Corp. Noteholders Litig.*, 177 F.R.D. at 170; *In re Chase Manhattan Corp. Sec. Litig*, 90 Civ. 6092, 1992 WL 110743 at *1 (S.D.N.Y. May 13, 1992).

**12.** Courts often analyze the Rule 23(a)(2) "commonality" requirement along with the Rule 23(b)(3) predominance requirement. *See, e.g., In re Natural Gas Commodities Litig.*, 231 F.R.D. 171, 180 (S.D.N.Y.2005) ("Courts often consider the requirements of Rule 23(a)(2) in conjunction with Rule 23(b)(3)."); *In re Sumitomo Copper Litig.*, 182 F.R.D. 85, 89 (S.D.N.Y.1998) (Pollack, D.J.) (same); 5 *Moore's Federal Practice* § 23.23[6] ("[T]he commonality requirement of Rule 23(a) tends to merge with the predominance inquiry with regard to a class action maintainable under Rule 23(b)(3).").

"In order to meet the predominance requirement of Rule 23(b)(3), a plaintiff must establish that 'the issues in the class action that are subject to generalized proof, and thus applicable to the class as a whole, ... predominate

Newman initially claimed that the common legal and factual issues in this case included: "(a) whether defendants violated §§ 349 and 350 of the New York General Business Law in that it engaged in deceptive acts and poor practices in the conduct of its business; (b) whether defendants breached their implied duty of good faith and fair dealing to members of the Class; [and] (c) whether defendants were unjustly enriched." (Dkt. No. 17: Newman Class Cert. Br. at 7.) However, in his reply papers, Newman dropped the class claim under General Business Law § 350, stating that he "seeks class status based on his claim that defendants violated New York General Business Law § 349. He limits his class claims on this motion to that section and not § 350 of the General Business Law." (Dkt. No. 35: Newman Class Cert. Reply Br. at 2.) Newman, however, personally retained the § 350 claim.[13] (*See* Dkt. No. 43: 2/14/06 Letter to the Court.)

New York General Business Law § 349 " 'declares unlawful deceptive acts or practices in the conduct of any business, trade or commerce or in the furnishing of any service.' " *In re Currency Conversion Fee Antitrust Litig.*, 230 F.R.D. 303, 310 (S.D.N.Y.2004) (quoting *Riordan v. Nationwide Mut. Fire Ins. Co.*, 977 F.2d 47, 51 (2d Cir.1992)), *modified on other grounds*, 2005 WL 1705285 (S.D.N.Y. July 22, 2005). " 'A plaintiff under section 349 must prove three

elements: first, that the challenged act or practice was consumer-oriented; second, that it was misleading in a material way; and third, that the plaintiff suffered injury as a result of the deceptive act.' " *In re Currency Conversion Fee Antitrust Litig.*, 230 F.R.D. at 310 (quoting *Stutman v. Chem. Bank*, 95 N.Y.2d 24, 29, 709 N.Y.S.2d 892, 895, 731 N.E.2d 608 (2000)).[14] "Additionally, the allegedly deceptive acts, representations or omissions must be misleading to 'a reasonable consumer.' " *Goshen v. Mutual Life Ins. Co.*, 98 N.Y.2d 314, 324, 746 N.Y.S.2d 858, 863, 774 N.E.2d 1190 (2002).[15] "The causation element is essential: 'The plaintiff . . . must show that the defendant's "material deceptive act" caused the injury.' " *In re Currency Conversion Fee Antitrust Litig.*, 230 F.R.D. at 310.[16] " 'In addition, a plaintiff must prove "actual" injury to recover under the statute, though not necessarily pecuniary harm.' " *In re Currency Conversion Fee Antitrust Litig.*, 230 F.R.D. at 310.[17] "However, assessment of specific causation often dissolves into a 'myriad of individualized causation inquiries.' " *In re Currency Conversion Fee Antitrust Litig.*, 230 F.R.D. at 310–11.

With respect to Newman's claim that subscribers to RCN's premium high speed internet service were paying for a higher speed than they were receiving, to show causation, each plaintiff will have to

over those issues that are subject only to individualized proof.' " *In re Visa Check/MasterMoney Antitrust Litig.*, 280 F.3d 124, 136 (2d Cir.2001), *cert. denied*, 536 U.S. 917, 122 S.Ct. 2382, 153 L.Ed.2d 201 (2002); *accord, e.g., Heerwagen v. Clear Channel Commc'ns*, 435 F.3d 219, 225–26 (2d Cir.2006); *In re NTL, Inc. Sec. Litig.*, 2006 WL 330113 at *12; *Fogarazzo v. Lehman Bros., Inc.*, 232 F.R.D. 176, 181–82 (S.D.N.Y.2005). Ultimately, "[t]he Rule 23(b)(3) predominance inquiry tests whether proposed classes are sufficiently cohesive to warrant adjudication by representation." *Amchem Prods., Inc. v. Windsor*, 521 U.S. 591, 623, 117 S.Ct. 2231, 2249, 138 L.Ed.2d 689 (1997).
For the reasons discussed in text, even if there were sufficient common questions of law or fact to satisfy the Rule 23(a)(2) commonality requirement, the predominance requirement of Rule 23(b)(3) is not satisfied.

**13.** General Business Law § 350 provides: "False advertising in the conduct of any business, trade

or commerce or in the furnishing of any service in this state is hereby declared unlawful."

**14.** Accord, e.g., *Maurizio v. Goldsmith*, 230 F.3d 518, 521–22 (2d Cir.2000); *Rabouin v. Metro. Life Ins. Co.*, 25 A.D.3d 349, 806 N.Y.S.2d 584, 585 (1st Dep't 2006).

**15.** See also, e.g., *Oswego Laborers' Local 214 Pension Fund v. Marine Midland Bank, N.A.*, 85 N.Y.2d 20, 26–27, 623 N.Y.S.2d 529, 533, 647 N.E.2d 741 (1995).

**16.** See also, e.g., *Petitt v. Celebrity Cruises, Inc.*, 153 F.Supp.2d 240, 266 (S.D.N.Y.2001); *Stutman v. Chem. Bank*, 95 N.Y.2d at 29, 709 N.Y.S.2d at 896, 731 N.E.2d 608.

**17.** See, e.g., *Stutman v. Chem. Bank*, 95 N.Y.2d at 29, 709 N.Y.S.2d at 896, 731 N.E.2d at 608; *Oswego Laborers' Local 214 Pension Fund v. Marine Midland Bank, N.A.*, 85 N.Y.2d at 26, 623 N.Y.S.2d at 533, 647 N.E.2d 741.

show that RCN's disclosures of the approximate internet speeds were inadequate, thus deceiving plaintiffs into subscribing to RCN's premium high speed internet service, and that each plaintiff actually did not receive the advertised speeds. As RCN asserts, this showing will require an individualized inquiry into many different issues, including:

(1) Whether *each* class member saw the same two alleged misrepresentations that Plaintiff offers in his case; (2) Whether each was influenced to subscribe to Mach 7 or Mach 10 based on either of them; (3) Whether the proposed members were existing RCN subscribers when obtaining Mach 7 or Mach 10 service, and had signed RCN's Customer Agreement; (4) Whether any of those RCN subscribers had read and understood the limitations and disclaimers contained in any of RCN's Customer Agreements; (5) What independent investigation any proposed member made concerning internet networks or speeds prior to subscribing; (6) What alternative sources of information or knowledge each proposed member had concerning internet access services; (7) Given those sources of information and knowledge, whether each individual subscriber could "reasonably" have been misled by any representation; (8) Whether any proposed members even perceived a slowdown; (9) Whether any proposed members actually experienced a slowdown caused by RCN's network, as compared to other forces beyond RCN's control; (10) What hardware or software was used by each subscriber to connect to the RCN network; (11) What type of computer each subscriber used, and what was its CPU capability; (12) What antivirus or firewall protection each proposed member had; (13) What particular website or servers on the internet were contacted by each subscriber, when and how often; (14) What type and size of data was attempted to be transferred, when and how often; (15) When, how often and for how long any slowdown was noticed; (16) What were the conditions of the website attempting to be accessed by the user at the time of any perceived slowdown; (17) What were the conditions of RCN's network at the time of any perceived slowdown; and (18) What was the route of travel for data chosen by the website a subscriber sought to access; [and] (19) What were the overall conditions of the internet at the time.

(Dkt. No. 38: 1/16/06 RCN Opp. Br. at 29–30.) While some common questions concerning RCN's internet speeds exist, individual questions regarding causation would overwhelm them. Accordingly, Newman's claim that subscribers to RCN's premium high speed internet service were paying for a higher speed than they were receiving is not appropriate for class certification.

██ With respect to Newman's claim that RCN caused subscribers to pay for additional high speed internet service without obtaining their prior consent, each plaintiff will have to show that RCN's disclosure of the automatic conversion to a la carte pricing upon unbundling of services was misleading to a reasonable consumer. (*See* cases cited at pages 74 – 75 above.) Newman will have a difficult time showing that the disclosures that he received were inadequate. The RCN advertisements that Newman proffers specifically state that "If a portion of the package is canceled (by customer voluntarily or due to non-payment), remaining service charges will revert to a la carte rates. . . . All prices and packages are subject to change." (Dkt. No. 35: Newman Aff. Ex. 1 at RCN5145–46.) Indeed, Newman testified that he understood that if he did not buy the three services together as a bundle, the price of each service would be higher if he were paying for them a la carte. (Dkt. No. 26: Arturi Aff. Ex. B: Newman Dep. at 142.) Newman also testified that he understood that RCN could change its rates as long as they notified customers in advance. (*Id.* at 142–43.) To prove causation for each plaintiff on this claim would entail similar individual inquiries, including an examination of each subscriber's understanding of the a la carte pricing system and whether that understanding was reasonable. Therefore, while some common questions exist concerning RCN's conversion of subscribers to a la carte pricing upon their unbundling of services, individual questions would overwhelm them. Accordingly, Newman's § 349 claim that defendants caused subscribers to pay for additional ser-

vice without obtaining their prior consent is not appropriate for class certification. *See, e.g., Moore v. PaineWebber, Inc.,* 306 F.3d 1247, 1255–56 (2d Cir.2002) (class certification of fraud claims inappropriate where plaintiffs could not show materially uniform misrepresentations); *In re Currency Conversion Fee Antitrust Litig.,* 230 F.R.D. at 311 (Section 349 claim not appropriate for class certification where individual questions about causation would overwhelm common questions of law and fact); *Rabouin v. Metro. Life Ins. Co.,* 806 N.Y.S.2d at 585 (class certification inappropriate for § 349 claim where issue of whether alleged deceptive acts were misleading in a material way would necessitate the resolution of individual issues); *DeFilippo v. Mut. Life Ins. Co.,* 13 A.D.3d 178, 180, 787 N.Y.S.2d 11, 14 (1st Dep't 2004) (class certification inappropriate where proving § 349 claim " 'would require individualized proof in the case of each class member, which would in turn raise questions that would overwhelm any issues common to the class' "); *Gaidon v. Guardian Life Ins. Co.,* 2 A.D.3d 130, 130, 767 N.Y.S.2d 599, 599–600 (1st Dep't 2003) (class certification of § 349 claim not appropriate where plaintiffs would have to show individualized proof for each class member as to the alleged oral misrepresentations); *Hazelhurst v. Brita Prods. Co.,* 295 A.D.2d 240, 242, 744 N.Y.S.2d 31, 33 (1st Dep't 2002) (class certification of § 349 claim not appropriate where proof of injury would require individual determinations); *Carnegie v. H & R Block, Inc.,* 269 A.D.2d 145, 147, 703 N.Y.S.2d 27, 29 (1st Dep't 2000) (class certification of § 349 claim not appropriate where "questions of whether each individual was exposed to, and influenced by, the advertising would predominate"); *Small v. Lorillard Tobacco Co.,* 252 A.D.2d 1, 9–12, 679 N.Y.S.2d 593, 600–02 (1st Dep't 1998) (class certification not appropriate in tobacco lawsuit under § 349 where individual issues of causation and damages would predominate), *aff'd,* 94 N.Y.2d 43, 698 N.Y.S.2d 615, 720 N.E.2d 892 (1999).

### 3. *Typicality*

Typicality under Rule 23(a) "requires that the claims of the class representatives be typical of those of the class, and 'is satisfied when each class member's claim arises from the same course of events, and each class member makes similar legal arguments to prove the defendant's liability.' " *Marisol A. v. Giuliani,* 126 F.3d 372, 376 (2d Cir.1997) (quoting *In re Drexel Burnham Lambert Group, Inc.,* 960 F.2d 285, 291 (2d Cir.1992), *cert. dismissed,* 506 U.S. 1088, 113 S.Ct. 1070, 122 L.Ed.2d 497 (1993)).[18] "The commonality and typicality requirements of Rule 23(a) tend to merge. Both serve as guideposts for determining whether under the particular circumstances maintenance of a class action is economical and whether the named plaintiff's claim and the class claims are so interrelated that the interests of the class members will be fairly and adequately protected in their absence." *Gen. Tel. Co. v. Falcon,* 457 U.S. 147, 158 n. 13, 102 S.Ct. 2364, 2371 n. 13, 72 L.Ed.2d 740 (1982).[19]

" 'While it is settled that the mere existence of individualized factual questions with respect to the class representative's claim will not bar class certification, class certification is inappropriate where a putative class representative is subject to unique defenses which threaten to become the focus of the litigation.' " *Baffa v. Donaldson, Lufkin & Jenrette Sec. Corp.,* 222 F.3d 52, 59 (2d Cir.2000).[20] "However, 'the rule

---

18. *Accord, e.g., Robinson v. Metro–North Commuter R.R.,* 267 F.3d 147, 155 (2d Cir.2001), *cert. denied,* 535 U.S. 951, 122 S.Ct. 1349, 152 L.Ed.2d 251 (2002); *In re NTL, Inc. Sec. Litig.,* 02 Civ. 3013, 2006 WL 330113 at *7 (S.D.N.Y. Feb.14, 2006) (Peck, M.J.); *Bolanos v. Norwegian Cruise Lines Ltd.,* 212 F.R.D. 144, 155 (S.D.N.Y. 2002) (Berman, D.J. & Peck, M.J.); *In re Towers Fin. Corp. Noteholders Litig.,* 177 F.R.D. 167, 170 (S.D.N.Y.1997) (Knapp, D.J. & Peck, M.J.).

19. *Accord, e.g., Marisol A. v. Giuliani,* 126 F.3d at 376; *Caridad v. Metro–North Commuter R.R.,* 191 F.3d 283, 291 (2d Cir.1999), *cert. denied,* 529 U.S. 1107, 120 S.Ct. 1959, 146 L.Ed.2d 791 (2000); *In re NTL, Inc. Sec. Litig.,* 2006 WL 330113 at *7; *Bolanos v. Norwegian Cruise Lines Ltd.,* 212 F.R.D. at 155; *In re Towers Fin. Corp. Noteholders Litig.,* 177 F.R.D. at 170.

20. *Accord, e.g., In re NTL, Inc. Sec. Litig.,* 2006 WL 330113 at *7; *In re Initial Pub. Offering Sec. Litig.,* 227 F.R.D. 65, 95 (S.D.N.Y.2004); *Bolanos v. Norwegian Cruise Lines Ltd.,* 212 F.R.D. at 156; *Koppel v. 4987 Corp.,* 191 F.R.D. 360, 365

barring certification of plaintiffs subject to unique defenses is not rigidly applied in this Circuit'; it has generally been applied only where a full defense is available against an individual plaintiff's action." *Koppel v. 4987 Corp.*, 191 F.R.D. at 365 (quoting *In re Frontier Ins. Group, Inc. Sec. Litig.*, 172 F.R.D. 31, 41 (E.D.N.Y.1997)). The unique defense rule is "intended to protect [the] plaintiff class—not to shield defendants from a potentially meritorious suit." *Trief v. Dun & Bradstreet Corp.*, 144 F.R.D. 193, 200–01 (S.D.N.Y.1992); *accord, e.g., In re NTL, Inc. Sec. Litig.*, 2006 WL 330113 at *7; *Koppel v. 4987 Corp.*, 191 F.R.D. at 365.

Newman asserts that his "claims are typical of the claims of the class and he has the same interests as the other members of the class." (Dkt. No. 17: Newman Class Cert. Br. at 7–8.) RCN argues that Newman is atypical (a) because he cannot show that he and the other potential class members were exposed to one particular advertisement when they subscribed for RCN's high speed internet service (Dkt. No. 38: 1/16/06 RCN Opp. Br. at 18–26), and (b) because he continued to pay his bills after he knew that RCN was charging him $25.00 per month extra for premium internet service and after he knew that he might not be receiving the speed of internet service he was expecting (*id.* at 31–33, 39–40).

### a. *Exposure to the Same Alleged Misrepresentation*

As discussed above, "to prevail in a cause of action under General Business Law §§ 349 and 350, the plaintiff must prove that the defendant made misrepresentations or omissions that were likely to mislead a reasonable consumer in the plaintiff's circumstances, that the plaintiff was deceived by those misrepresentations or omissions and that as a result the plaintiff suffered injury." *Solomon v. Bell Atl. Corp.*, 9 A.D.3d 49, 52, 777 N.Y.S.2d 50, 55 (1st Dep't

2004).[21] "In a class action alleging deceptive acts and practices . . ., the proof must show that each plaintiff was reasonably deceived by the defendant's misrepresentations or omissions and was injured by reason thereof." *Solomon v. Bell Atl. Corp.*, 9 A.D.3d at 52, 777 N.Y.S.2d at 55. "Therefore, certification . . . under General Business Law §§ 349 and 350 may be appropriate where the plaintiffs allege that all members of the class were exposed to the same misrepresentations." *Solomon v. Bell Atl. Corp.*, 9 A.D.3d at 52–53, 777 N.Y.S.2d at 55.[22] "However, class certification is not appropriate where the 'plaintiffs do not point to any specific advertisement or public pronouncement by the [defendants] . . . which was undoubtedly seen by all class members.'" *Solomon v. Bell Atlantic Corp.*, 9 A.D.3d at 53, 777 N.Y.S.2d at 55 (quoting *Small v. Lorillard Tobacco Co.*, 252 A.D.2d 1, 9, 679 N.Y.S.2d 593, 600 (1st Dep't 1998), *aff'd*, 94 N.Y.2d 43, 698 N.Y.S.2d 615, 720 N.E.2d 892 (1999)); *see also, e.g., Carnegie v. H & R Block, Inc.*, 269 A.D.2d 145, 147, 703 N.Y.S.2d 27, 29 (1st Dep't 2000).

Newman has not demonstrated that all members of the class were exposed to the same advertisements. Indeed, Newman testified during his deposition that no one particular advertisement influenced him to sign up for RCN service and that he did not remember the contents of any particular RCN advertisements that he received during 2003. (Dkt. No. 26: Arturi Aff. Ex. B: Newman Dep. at 130–32.) In addition, Newman stated that he could not recall any particular advertisement regarding the promised speed of Mach 7 and Mach 10 service, although he remembered looking on the RCN web site and fliers that he received in the mail. (*Id.* at 229.) Newman also testified that none of the fliers that he received in the mail induced him to pay for premium internet service from RCN because he never wanted the faster speed in the first place.

(S.D.N.Y.2000); 5 *Moore's Federal Practice* § 23.24[5].

**21.** *See, e.g., Goshen v. Mut. Life Ins. Co.*, 98 N.Y.2d 314, 324, 746 N.Y.S.2d 858, 863, 774 N.E.2d 1190 (2002); *see also* cases cited at pages 74 – 75 above.

**22.** *See also, e.g., Broder v. MBNA Corp.*, 281 A.D.2d 369, 371, 722 N.Y.S.2d 524, 526 (1st Dep't 2001); *Taylor v. American Bankers Ins. Group*, 267 A.D.2d 178, 178, 700 N.Y.S.2d 458, 459 (1st Dep't 1999).

(*Id.* at 233.) Newman has not alleged that the different RCN advertisements all included the same misrepresentation (despite having extensive discovery from RCN before the conclusion of briefing on the class certification motion). Therefore, Newman has not established typicality because he has not shown that he and other members of the class all relied on the same misrepresentation by RCN when subscribing to high speed internet service. *See, e.g., Small v. Lorillard Tobacco Co.,* 252 A.D.2d at 9, 679 N.Y.S.2d at 600 (class certification of § 349 claim inappropriate where " '[t]he complaint does not show any one misrepresentation, or group of misrepresentations, or common thread that may be applicable to substantially the entire group' "); *Solomon v. Bell Atl. Corp.,* 9 A.D.3d at 53, 777 N.Y.S.2d at 55 (class certification inappropriate in § 349 claim where plaintiffs could not demonstrate that all members of the class saw the same advertisements); *Carnegie v. H & R Block, Inc.,* 269 A.D.2d at 147, 703 N.Y.S.2d at 29 (class certification inappropriate where lead plaintiff was atypical of class because she was not exposed to any of the same advertising to which the class was exposed).

### b. *The Voluntary Payment Doctrine*

The voluntary payment doctrine "bars recovery of payments voluntarily made 'with full knowledge of the facts.' " *Solomon v. Bell Atl. Corp.,* 9 A.D.3d 49, 55, 777 N.Y.S.2d 50, 56 (1st Dep't 2004) (quoting *Dillon v. U–A Columbia Cablevision of Westchester, Inc.,* 100 N.Y.2d 525, 526, 760 N.Y.S.2d 726, 727, 790 N.E.2d 1155 (2003)). This doctrine would bar recovery by any RCN subscriber who, having experienced slower than advertised service, continued to pay for and use RCN's high speed internet service. *See Solomon v. Bell Atl. Corp.,* 9 A.D.3d at 55, 777 N.Y.S.2d at 56 (voluntary payment doctrine "would bar recovery by any subscriber who, having experienced slow service . . . , continued to use defendants' DSL service."). This doctrine also would bar recovery by any RCN subscriber who paid his or her bill even though it contained an extra $25.00 per charge for premium high speed internet service. Newman falls squarely within these descriptions. After performing his internet speed tests on December 16, 2004 and seeing that he was only receiving data at approximately 5 Mbps (Dkt. No. 26: Arturi Aff. Ex. B: Newman Dep. at 255; Arturi 2/8/06 Supp. Aff. Ex. B: Newman Dep. Ex. D–19 at NEWMAN00003–08), Newman continued to pay his bills without dispute for premium high speed internet service for December 2004, January 2005, and February 2005 (Dkt. No. 39: Tyson Aff. ¶¶ 71, 73, 80–82, 88–89). In addition, after an extra $25.00 per month charge for premium high speed internet service appeared on his bill, Newman continued to pay his bills without dispute. (*Id.*) Newman is therefore an atypical plaintiff because he is subject to an affirmative defense based on the voluntary payment doctrine that raises individual issues about his own claims. *See Gary Plastic Packaging Corp. v. Merrill Lynch, Pierce, Fenner & Smith, Inc.,* 903 F.2d 176, 179–80 (2d Cir.1990) (class certification properly denied because plaintiff was inappropriate class representative because its claim was subject to several unique defenses, including the fact that it continued to purchase the disputed CDs despite having knowledge of the alleged fraud), *cert. denied,* 498 U.S. 1025, 111 S.Ct. 675, 112 L.Ed.2d 667 (1991); *In re Currency Conversion Fee Antitrust Litig.,* 230 F.R.D. 303, 308 (S.D.N.Y.2004) (class certification of § 349 claim not appropriate where plaintiff was atypical because he continued to use his credit card after discovering that defendant was charging him an extra currency conversion fee every time he used it), *modified on other grounds,* 2005 WL 1705285 (S.D.N.Y. July 22, 2005); *Dillon v. U–A Columbia Cablevision of Westchester, Inc.,* 100 N.Y.2d at 526, 760 N.Y.S.2d at 727, 790 N.E.2d 1155 (plaintiff's purported class action complaint barred based on voluntary payment doctrine when facts revealed that she paid defendant cable company the challenged extra fee with full knowledge of when and why the fee would be charged); *Solomon v. Bell Atlantic Corp.,* 9 A.D.3d at 55, 777 N.Y.S.2d at 56 (class certification of § 349 claim not appropriate where plaintiffs were atypical because they continued to subscribe to defendants' DSL service after experiencing slow service and/or frequent connectivity outages).

### 4. *Solomon v. Bell Atl. Corp. Is Directly On Point and Requires Denial of Class Certification*

The First Department's decision in *Solomon v. Bell Atlantic Corp.*, 9 A.D.3d 49, 777 N.Y.S.2d 50 (1st Dep't 2004), is directly on point, and requires denial of class certification. In *Solomon*, the First Department decertified a class of plaintiffs who claimed that Bell Atlantic's advertisements for its digital subscriber line ("DSL") internet access service, which described it as "126x faster than your 56K modem," were false and misleading in violation of General Business Law §§ 349–50. *Solomon v. Bell Atlantic Corp.*, 9 A.D.3d at 50–51, 777 N.Y.S.2d at 53.[23]

It is worth quoting from *Solomon* at length:

> Claims under General Business Law §§ 349 and 350 are available to "an individual consumer who falls victim to misrepresentations made by a seller of consumer goods through false or misleading advertising." To state such a claim, a plaintiff must allege that the defendant has engaged " 'in an act or practice that is deceptive or misleading in a material way and that plaintiff has been injured by reason thereof.' " Deceptive or misleading representations or omissions are defined objectively as those "likely to mislead a reasonable consumer acting reasonably under the circumstances," i.e., the plaintiff's circumstances.
>
> [T]o prevail in a cause of action under General Business Law §§ 349 and 350, the plaintiff must prove that the defendant made misrepresentations or omissions that were likely to mislead a reasonable consumer in the plaintiff's circumstances, that the plaintiff was deceived by those misrepresentations or omissions and that as a result the plaintiff suffered injury.

In a class action alleging deceptive acts and practices and false advertising, the proof must show that each plaintiff was reasonably deceived by the defendant's misrepresentations or omissions and was injured by reason thereof. Therefore, certification of a class for purposes of an action brought under General Business Law §§ 349 and 350 may be appropriate where the plaintiffs allege that all members of the class were exposed to the same misrepresentations.

However, *class certification is not appropriate where the "plaintiffs do not point to any specific advertisement or public pronouncement by the [defendants] . . . which was undoubtedly seen by all class members."*

Plaintiffs have not demonstrated that all members of the class saw the same advertisements. Indeed, *the record shows that the individual plaintiffs did not all see the same advertisements; some saw no advertisements at all before deciding to become subscribers.* Moreover, the content of defendants' DSL advertising varied widely and not all the advertisements contained the alleged misrepresentations. Thus, *questions of individual members' exposure to the allegedly deceptive advertising predominate.*

The motion court found that the variety of advertisements in different media using varying language presents no obstacle to class certification because "the various advertisements convey the same substantial message to the consuming public—speed and ease of DSL service." This conclusion . . . fails to address the uncontested fact that some subscribers saw none of these advertisements but learned of DSL through word of mouth. . . .

*Even assuming that all the members of the class saw the same advertisements, questions as to whether each individual*

---

**23.** Newman's reply brief asserts that *Solomon* "involved a GBL § 350 claim," and that "[f]or § 349 claims, *Solomon* does not apply." (Dkt. No. 35: Newman Class Cert. Reply Br. at 3.) Newman is simply wrong. *Solomon* clearly involved analysis of claims brought under *both* General Business Law § 349 and § 350. Newman correctly cites *Cox v. Microsoft Corp.*, 10 Misc.3d 1055(A), 2005 WL 3288130 at *4 (Sup. Ct.N.Y.Co. July 29, 2005), for the proposition that while reliance need be shown for a § 350 claim, it need not be shown under § 349. Causation, however, remains an element of a § 349 claim, and the issue of whether any deceptive ads as to RCN's internet speed caused injury to class members requires individual determinations, as described in *Solomon*.

*was reasonably misled by them predominate, given the alternative sources of information about DSL service that each may have had.* One of the individual plaintiffs who learned about DSL service through word of mouth testified that he spoke to three or four people who were using the service and he heard both "good things" and "complaints" about it. Another testified that he read articles in computer magazines comparing DSL service to cable modem service. Other sources of information include the terms and conditions in the service agreement containing disclaimers "that address the very service glitches plaintiffs cite," and the 30–day trial period, during which subscribers could cancel with no obligation. Thus, individual trials would be required to determine whether a reasonable consumer acting reasonably in each plaintiff's circumstances would have been misled by defendants' representations.

*As to proof of injury, individual trials would be required to determine which plaintiffs experienced either slower than advertised Internet download speeds or connectivity outages and the nature, cause and extent of those adverse experiences.* It is uncontested, for example, that *DSL speed is dependent on a number of factors,* including the subscriber's own computer and network elements that are unrelated to the service itself, such as the server on which the Web site sought to be accessed resides.

*Individual trials also would be required to determine damages based on the extent of each plaintiff's injuries, i.e., the slowness of service* and/or the frequency and duration of connectivity outages, if any. *The determination of the degree to which an individual consumer's service was slow requires consideration of many factors,* such as whether the consumer's speed was already limited by the Web site accessed or congestion on the Internet.

Defendants also assert certain affirmative *defenses that raise individual issues.* One such defense is the *voluntary payment doctrine,* which bars recovery of payments voluntarily made "with full knowledge of the facts" and would bar recovery

by any subscriber who, having experienced slow service and/or frequent connectivity outages, continued to use defendants' DSL service. *One of the three individual plaintiffs who have continued to subscribe to the service despite their complaints testified that he believed that DSL service is presently worth more than he is paying for it. . . .*

*Additional defenses are the terms and conditions* and the 30–day trial period discussed above in connection with the various sources of information available to consumers apart from defendants' advertisements. While some of the individual plaintiffs testified that they accepted the terms and conditions after reading them, others testified that they accepted the terms and conditions without reading them, and one plaintiff testified that, although she did not remember reading the terms and conditions, she "must have agreed" to them. *To determine actual injury, individual trials would be required to demonstrate which statements and/or disclaimers each plaintiff read* and why he or she continued to receive the service even after the 30–day trial period.

As to the third prerequisite for class certification, the seven individual plaintiffs have not demonstrated that they are typical of the class. Indeed, they would appear to have demonstrated that *there is no typical plaintiff.* The record reflects differences among the individual plaintiffs as to which advertisements they saw, whether they saw any ads or obtained information by which to evaluate DSL service from other sources, whether they received billing credits, whether they read the terms and conditions and agreed to them, the nature and extent of their injuries, and the damages they claim.

*Solomon v. Bell Atlantic Corp.,* 9 A.D.3d at 52–56, 777 N.Y.S.2d at 54–57 (citations omitted & emphasis added).

Here, as in *Solomon,* Newman has not pointed to any common advertisement seen by all class members, or common misrepresentations in different advertisements. Moreover, as in *Solomon,* individual determi-

nations of why each class member subscribed to RCN's internet service would predominate (*e.g.*, Newman himself did not rely on the representations as to speed in signing up for RCN's internet service). Here, as in *Solomon*, proof of injury and damages would require individual trials as to which class members received slower than advertised speeds and why. Indeed, since bundled RCN customers received RCN's highest internet speed (currently, Mach 10) for *no* additional cost, the only customers who could claim damages are those who bought the higher speed at a la carte prices.[24] Here, as in *Solomon*, the voluntary payment doctrine defense will raise individual issues, as will issues concerning the applicability of RCN's Terms and Conditions and other customer agreements, including the information about a la carte pricing where a customer cancels part of a bundled package.

Here, as in *Solomon*, the correct result is denial of class certification.[25]

## CONCLUSION

For the reasons set forth above, the Court should deny class certification. Because jurisdiction in this case is based solely on its maintenance as a class action under 28 U.S.C. § 1453, Newman's individual case should be remanded to state court upon denial of class certification.

## FILING OF OBJECTIONS TO THIS REPORT AND RECOMMENDATION

Pursuant to 28 U.S.C. § 636(b)(1) and Rule 72(b) of the Federal Rules of Civil Procedure, the parties shall have ten (10) days from service of this Report to file written objections. *See also* Fed.R.Civ.P. 6. Such objections (and any responses to objections) shall be filed with the Clerk of the Court, with courtesy copies delivered to the chambers of the Honorable Victor Marrero, 40 Centre Street, Room 414, and to my chambers, 500 Pearl Street, Room 1370. Any requests for an extension of time for filing objections must be directed to Judge Marrero (with a courtesy copy to my chambers). Failure to file objections will result in a waiver of those objections for purposes of appeal. *Thomas v. Arn*, 474 U.S. 140, 106 S.Ct. 466, 88 L.Ed.2d 435 (1985); *IUE AFL–CIO Pension Fund v. Herrmann*, 9 F.3d 1049, 1054 (2d Cir.1993), *cert. denied*, 513 U.S. 822, 115 S.Ct. 86, 130 L.Ed.2d 38 (1994); *Roldan v. Racette*, 984 F.2d 85, 89 (2d Cir. 1993); *Frank v. Johnson*, 968 F.2d 298, 300 (2d Cir.), *cert. denied*, 506 U.S. 1038, 113 S.Ct. 825, 121 L.Ed.2d 696 (1992); *Small v. Secretary of Health & Human Servs.*, 892 F.2d 15, 16 (2d Cir.1989); *Wesolek v. Cana-*

---

**24.** Indeed, by the time Newman's counsel filed his reply brief, the claims may have morphed again—to a claim that RCN's ads claimed that Mach 7 (and Mach 10) were faster than the speed of other internet providers. (*See* Dkt. No. 35: Newman Class Cert. Reply Br. at 3.) If that is Newman's current position (which is not clear from the reply brief), it comes too late, and is not at all supported by any record information, and the Court will not consider it.

**25.** The fourth Rule 23(a) factor is adequacy of representation, which includes the adequacy of class counsel. Fed.R.Civ.P. 23(a), 23(g); *see generally In re NTL, Inc. Sec. Litig.*, 02 Civ. 3013, 2006 WL 330113 at *11 (S.D.N.Y. Feb.14, 2006) (Peck, M.J.) ( & cases cited therein). While the Court has some concerns as to how Newman's counsel has litigated this case so far (including the changes in Newman's own claims from the complaint to his deposition testimony, and the dropping of the § 350 class claim), the Court need not address this issue because there are sufficient other reasons, discussed above, to deny class certification.

"In addition to satisfying Rule 23(a)'s prerequisites, parties seeking class certification must show that the action is maintainable under Rule 23(b)(1), (2), or (3)." *Amchem Prods., Inc. v. Windsor*, 521 U.S. 591, 614, 117 S.Ct. 2231, 2245, 138 L.Ed.2d 689 (1997); *accord, e.g., In re NTL, Inc. Sec. Litig.*, 02 Civ. 3013, 2006 WL 330113 at *12 (S.D.N.Y. Feb.14, 2006) (Peck, M.J.) (& cases cited therein). Rule 23(b)(3) states that: "An action may be maintained as a class action if the prerequisites of [Rule 23(a)] are satisfied, and in addition ... the court finds that the questions of law or fact common to the members of the class predominate over any questions affecting only individual members, and that a class action is superior to other available methods for the fair and efficient adjudication of the controversy." Fed.R.Civ.P. 23(b); *see generally Amchem Prods., Inc. v. Windsor*, 521 U.S. at 615–16, 117 S.Ct. at 2246. Because plaintiff Newman has not satisfied the prerequisites of Rule 23(a), the Court need not further discuss the requirements of Rule 23(b), except to the extent already discussed above as to predominance.

*dair Ltd.*, 838 F.2d 55, 57–59 (2d Cir.1988); *McCarthy v. Manson*, 714 F.2d 234, 237–38 (2d Cir.1983); 28 U.S.C. § 636(b)(1); Fed. R.Civ.P. 72, 6(a), 6(e).

Dated: March 7, 2006.